**Cynthia M. BAUSMAN, Plaintiff,**

**v.**

**INTERSTATE BRANDS CORPORATION, Defendant.**

**No. 96–4119–SAC.**

United States District Court, D. Kansas.

April 30, 1999.

Order Denying Motion to Amend, June 18, 1999.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for plaintiff.

Steven S. Griswold, Griswold Law Firm, P.C., Kansas City, MO, James R. Holland II, Leonard Singer, Bioff, Singer & Finucane, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This retaliatory discharge case comes before the court on the following motions: the plaintiff Cynthia M. Bausman's ("Bausman") motion for partial summary judgment (Dk.35); the defendant Interstate Brands Corporation's ("Interstate Brands" or "IBC") motion for summary judgment (Dk.37); and the plaintiff Bausman's motion to strike (Dk.44) the affidavit of Robert Lincoln (Dk.39, Ex. 6) submitted by the defendant in support of its motion for summary judgment.

### OVERVIEW OF CASE

Bausman worked for Interstate Brands from June 28, 1986, until she was fired on July 5, 1994, allegedly for habitual absenteeism. Bausman suffered work-related injuries that resulted in surgery on January 14, 1993. Prior to her termination, Bausman had initiated proceedings under the Kansas Workers' Compensation Act.

### MOTION TO STRIKE (Dk.44).

The plaintiff seeks to strike a statement from the affidavit of the defendant's personnel manager, Robert Lincoln. Specifically, the plaintiff contends that Lincoln's deposition testimony is contrary to the following statement appearing in his affidavit: "At the time IBC terminated Bausman's employment, IBC did not know that the absences which caused her discharge were due to her alleged work caused medical condition." (Dk.39, Ex. 6, ¶ 11). The plaintiff argues this averment is contradicted by Lincoln's deposition testimony that he knew prior to Bausman's termination (1) that Bausman was complaining she had missed work because of physical problems to the same body areas for which she was making a workers' compensation claim; (Lincoln Dep. p. 70); (2) that Bausman believed and had opined she was being penalized for absences necessitated by her work-related injuries (Lincoln Dep. pp. 71, 73). The plaintiff also contends Lincoln's averment is contradicted by evidence that he had received from Bausman's attorneys a letter claiming all of Bausman's absences from April 26 through June 13, 1994, were "part and parcel of her workers' compensation claim," (Dk.45, Ex. 2).

In response, the defendant notes that Lincoln testified in his deposition that prior to her termination he had learned Bausman was claiming her absences were necessitated by her work-related injuries but that he had not received any physician's note establishing this cause as required under IBC's practice. The defendant argues that without a proper physician's note it does not know the reason or need for an employee's absence.

A court may sanction a party who presents an affidavit in bad faith in a summary judgment proceeding. Fed. R.Civ.P. 56(g). It follows that a court has the discretion to strike sham affidavits submitted pursuant to Rule 56. *Barber v. Hallmark Cards, Inc.*, No. 93–4087–SAC, 1994 WL 568872, (D.Kan. Sep.14, 1994), *aff'd*, 74 F.3d 1248 (10th Cir.) (table), *cert. denied*, 519 U.S. 816, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996); *Cook v. Babbitt*, 819 F.Supp. 1, 21 (D.D.C.1993); *see, e.g., Butler v. City of Prairie Village*, 974 F.Supp.

1386, 1391 (D.Kan.1997), *aff'd in part and rev'd in part on other grounds,* 172 F.3d 736 (10th Cir.1999). An affidavit in support of a summary judgment memorandum "is not automatically disregarded" because it conflicts with the affiant's prior deposition testimony. *Durtsche v. American Colloid Co.,* 958 F.2d 1007, 1010 n. 2 (10th Cir.1992); *see Independent Drug Wholesalers Group, Inc. v. Denton,* 833 F.Supp. 1507, 1520 (D.Kan.1993). A conflicting affidavit can be disregarded if the court first determines that the affidavit is "simply an attempt to create a 'sham fact issue.'" *Durtsche v. American Colloid Co.,* 958 F.2d at 1010 n. 2 (quoting *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986)). Factors relevant in this determination include: "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks,* 796 F.2d at 1237 (citations omitted).

In *Franks,* the Tenth Circuit struck a subsequent affidavit where the witness was carefully cross-examined, had access to the relevant evidence at the time of his deposition, and his testimony was "unequivocal." *Id.* Likewise, in *Rios v. Bigler,* 67 F.3d 1543, 1552 (10th Cir.1995), the court affirmed a district court's ruling striking an affidavit where the witness repeatedly and consistently answered the question in the same manner at his deposition so that his "deposition testimony was unequivocal." Finally, in *Barber v. Hallmark Cards, Inc.,* the Tenth Circuit affirmed the district court's order that struck the plaintiff's affidavit where the plaintiff's counsel had the opportunity to cross-examine the plaintiff at her deposition, where the affidavit and deposition testimony were irreconcilable on their face, and where the plaintiff unequivocally testified one way without any apparent confusion. 1996 WL 21274, at *2.

The court is not persuaded that this is an instance where a conflicting affidavit is being submitted to create a sham issue of fact. For the most part, Lincoln's deposition testimony is consistent with his averment at paragraph eleven. In his deposition, Lincoln generally distinguished between his knowledge of what Bausman was claiming as her reason for the absences and the company's knowledge about the absences based on the company's absenteeism policy and practice. When read in this light, Lincoln's averment does not present an irreconcilable conflict with his deposition. Having failed to demonstrate that Lincoln's affidavit is an attempt to create a sham issue of fact, the plaintiff is denied all relief on her motion to strike.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that

demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P.1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF MATERIAL UNCONTROVERTED FACTS

For purposes of these motions only and the issues relevant to the decision rendered here, the court considers the following material facts to be uncontroverted:

1. From June 28, 1986, to July 5, 1994, Bausman worked for IBC at its bakery in Emporia, Kansas, where it produces snack cakes and related products. Brett Drum supervised Bausman from 1993 until she was fired.

2. Bakery Workers Local Union No. 218 ("Union") represents the employees at the bakery. A labor contract between the Union and IBC governs the terms and conditions of employment at the bakery.

3. In July 1992, Bausman first notified IBC that she had a repetitive motion stress injury to her elbow, wrist and shoulder caused by her work at the Bakery.

3. IBC has a written attendance policy that applies to all employees. In relevant part, the policy disciplines employees for absences without notification, tardiness, leaving early from work, and for excessive absences. The policy provides that an employee will receive a "charged absence" for not coming to work when scheduled, for leaving work early, and for being late to work by more than five minutes. Based on the number of absences during a six-month period, the policy imposes the following discipline: (1) oral warning after four absences; (2) written warning after five absences; (3) decision day off with pay after six absences; and (4) discharge after seven absences. The policy also establishes an "habitual absentee" status for employees who have eight absences during a twelve-month period. Upon notification of being an habitual absentee, an employee may be discharged if absent during the following six-month period. The policy contains the following exception concerning absences for extended illness:

Employees who phone in pending absences daily (more than (1) day) shall have each day of absence count as a

single occurrence, unless the employee furnishes a physician's certificate documenting diagnosis, treatment, and the necessity for multiple days of absence. The Company may elect to count the multiple days of absence as a single occurrence.

(Dk. 39, Tab 9). The labor contract also required employees to furnish a doctor's slip for illnesses just before or after a holiday. Prior to her termination, Bausman was aware that in these two situations IBC required a physician's note.

4. Though not appearing in its written attendance policy effective January 1, 1991, IBC apparently followed a rule that did not charge employees with absences caused by work-related injuries. Representatives of IBC's management had told Bausman of this rule.

5. According to various IBC management personnel at the Emporia bakery, including Robert Lincoln, the personnel manager at this bakery and the individual in charge of administering IBC's attendance policies, IBC's rule and practice was that it would not exempt absences as being caused by work-related injuries unless the employee provided a note from a physician stating that the absence was due to a work-related injury. Donald Wilson, IBC's production manager, testified that without this doctor's note the employee would be charged with an absence regardless of the employee's or the supervisor's opinion that the absence was due to work-related injuries. Wilson further testified he was unaware of any written policy at IBC that prohibited him from believing an employee's representation without a doctor's note and excusing an absence as due to work-related injuries. When asked what then kept him from doing this, Wilson answered: "If you did that once, you might as well excuse them all, and it's not right to do it for one and not the others." (Dk.46, Ex. 1, p. 44). Bausman testified that she was unaware of any requirement for a physician's note regarding absences due to work-related injury and that she believed the company was obligated to accept her statement concerning her ab-

sences being the result of a work-related injury. Bausman did acknowledge that she had been told by her supervisors to bring notes from her physician and that on occasion she had brought such notes.

6. Brett Drum testified that an employee complaining of a work-related injury would be allowed to leave work but that the employee would be charged with an absence unless the employee later provided a physician's note stating the absence was due to the work-related injury.

7. From September of 1992 until May 1994, IBC did not discipline Bausman for any reason. Though she was absent from work during this period, most of the absences were attributed to her work-caused medical condition. Bausman underwent surgery for her condition on January 14, 1983, and consequently missed weeks of work. IBC did not assess any points for those absences.

8. In March of 1993, Bausman's physicians released her for work with certain restrictions, and IBC provided her work within those restrictions. In April of 1993, Bausman's physicians released her for work without any restrictions.

9. In May of 1993, Bausman sought and obtained a position on a line that required monitoring and removing wrapped cake products from a conveyor into a shipping tray. IBC rotates employees on this line every several hours to avoid employees doing the same task for the entire work day.

10. On May 2, 1994, IBC issued Bausman an oral warning for excessive absences. The written notice ("May 2nd warning") provided to Bausman listed six dates on which the plaintiff had been late or absent. Bausman testified that in her meeting with Brett Drum on this warning she told him that the absences in April were due to a work-related injury. When questioned whether Brett Drum told her "to bring in a doctor's note," Bausman answered, "I gave it to them after I came back." Bausman presented a note dated

May 4, 1994, from her family physician, Dr. Bernard, who was not authorized to treat her for the work-related stress injury. The note said: "Please excuse from work due to medical problems for dates April 26, 27, & 28." (Dk. 39, Tab 19). As a result of this physician's note, IBC charged Bausman with only one absence for April 26, 27 and 28. Bausman, however, never presented a physician's note stating that one or more of the absences listed on the May 2nd warning were due to work-related injury.

11. After the May 2nd warning, Bausman was absent from work for approximately two weeks commencing May 3, 1994. Bausman testified that she called Todd Crook with IBC and "told him that I had called the doctor and talked to him about being sick quite a bit, due to the medication for my arm, and that would take about two weeks to get it healed. I told this to Todd, and he said, 'Fine, you will need a doctor's slip.'" (Dk. 39, Tab 1, p. 104). With regard to this absence, Bausman presented two notes from Dr. Bernard. The note dated May 6, 1994, said: "Please excuse from work." The note dated May 11, 1994, said: "May return to work." At some point, Bausman gave IBC a Family and Medical Leave Act physician's certification form completed, signed and dated by Dr. Bernard on May 5, 1994. The certification states that Dr. Bernard saw Bausman on May 4, 1994, diagnosed her condition as "gastritis" commencing April 26, 1994, prescribed a medication, and concluded that Bausman "does not need to be off work for current condition." (Dk. 39, Tab·27). Because of these physician's notes, IBC charged Bausman with only one absence for the multiple days of work missed beginning on May 3, 1994.[1]

12. Bausman was absent on May 25, 1994. She never presented any physician's note concerning this absence.

13. On May 26, 1994, IBC issued an "Habitual Absentee Final Warning" ("Fi-nal Warning") that listed nine dates over the past twelve months when she failed to work as scheduled. The warning further stated: "As of 5–26–94, your record will be frozen at your current level of 9 absences. *Any absences in the next six months before 11–25–94 will result in your discharge.*" Bausman never presented to IBC a physician's note which identified any of the absences on the Final Warning as being due to her work-caused medical condition.

14. After receiving the Final Warning, Bausman left work early on May 27, 1994, and subsequently was absent from work for many of the days through June 17, 1994. Concerning these absences, Bausman presented to IBC the following two notes from her family physician, Dr. Bernard: "Cindy needs to remain off work until I see her 6/6/94," dated May 31, 1994; and "Cindy may return to work," dated June 6, 1994. Bausman also presented IBC with a physician's note dated June 16, 1994, from Newman Memorial County Hospital which stated, "needs to stay off work until hives gone for 24 hrs." None of these notes said that Bausman's absences or treatment were due to a work-related injury.

15. On June 24 and July 2, 1994, Bausman left work early saying her arm was sore. Her supervisor, Brett Drum, replaced her and told her that she must bring back a physician's slip when she returned to work. Bausman never presented any note from a physician concerning these two absences.

16. On July 5, 1994, Bausman was terminated. Donald Wilson, the production manager, called Bausman at home telling her that she need not report to work that day as she had been terminated for absences. The decision to fire Bausman was made by Robert Lincoln, the personnel manager, and Donald Wilson. In documenting the termination, the plaintiff's supervisor, Brett Drum, recorded on the "Notice of Separation" that Bausman was

1. It is controverted whether the plaintiff ever informed IBC that the medication taken for the stress injury had caused her gastritis or hives.

fired for "excessive absenteeism" with the following explanation: "She was going home early far too many times. She also was calling in at an excessive rate." (Dk. 36, Ex. "Separation Notice"). Lincoln testified that Bausman was fired solely because of her attendance record and not for her job performance, attitude, or other violations of company rules.

17. At the time of Bausman's termination, Lincoln knew that Bausman had left work early complaining occasionally of a sore arm and "of physical difficulties with the same parts of her body for which she was making a workers' compensation claim." (Dk. 46, Tab 2, Lincoln Dep. p. 70). Lincoln further knew at the time that Bausman's attorneys had written a letter dated June 13, 1994, taking the position that all of Bausman's "absences since April 26 through today are part and parcel of her workers' compensation claim." (Dk.45, Ex. 2). As for specific absences, Lincoln knew that Bausman was claiming she went home early on May 27th and went to the emergency room with complaints of arm pain and that he had received from someone a message which said that Bausman's absences on May 28th and 29th were due to "work comp."

18. IBC is self-insured for workers' compensation and, thus, receives reports on the benefits paid to and costs incurred for injured employees.

19. IBC had a written policy that said an employee injured on the job would wear for one year a red stripe on the employee's cap which indicated the employee had an accident. According to Lincoln, this program was voluntary and did not last even one year.

20. During the relevant time period, IBC's personnel department published a bi-weekly newsletter entitled "Dolly Talk." The newsletter occasionally included reports of accidents on the job.

21. IBC used various incentive programs. Under the "Win a Car" program, IBC divided the plant into two groups and conducted a drawing for a used car for whichever group went a specified period without an accident. IBC also awarded employees with dinners and other prizes for working specified periods without an accident.

22. Lincoln was aware of other employees complaining they had been assessed absences that were due to work-related injuries, but he did not know the frequency of such complaints and guessed they could be "once or twice a week." (Dk. 46, Tab 2, Lincoln Dep. p. 55–56).

## GENERAL RETALIATORY DISCHARGE LAW

 The burden rests with the plaintiff to prove that the defendant constructively discharged him in retaliation for filing a claim under the Kansas Workers' Compensation Act. *Ortega v. IBP*, 255 Kan. 513, 528, 874 P.2d 1188 (1994). The plaintiff can recover upon "proving that the discharge was 'based on,' 'because of,' 'motivated by' or 'due to' the employer's intent to retaliate." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir.1998) (quoting *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 146–148, 815 P.2d 72 (1991)). The plaintiff need not prove that retaliation was the employer's sole motive or reason for the termination. *Brown*, 249 Kan. at 147, 815 P.2d 72. The plaintiff must establish his claim "by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Ortega v. IBP*, 255 Kan. 513, 528, 874 P.2d 1188 (1994). Evidence is clear if "it is certain, unambiguous, and plain to the understanding." *Id.* "It is convincing if it is reasonable and persuasive enough to cause the trier of fact to believe it." *Id.* (citing *Chandler v. Central Oil Corp., Inc.*, 253 Kan. 50, 58, 853 P.2d 649 (1993)).[2]

---

**2.** For the evidence to be clear and convincing, "the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue." *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*,

■ In analyzing state retaliatory discharge claims in Kansas, the federal courts consistently have applied the United States Supreme Court's burden shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Sanjuan v. IBP, Inc.*, 160 F.3d at 1298; *Chaparro v. IBP, Inc.*, 104 F.3d 367, 1996 WL 733771, at *5 (10th Cir. Dec.24, 1996) (Table), *cert. denied*, —— U.S. ——, 118 S.Ct. 53, 139 L.Ed.2d 18 (1997); *see, e.g., Barnard v. ADM Milling Co., Inc.*, 987 F.Supp. 1337, 1344 (D.Kan.1997); *Deghand v. Wal–Mart Stores, Inc.*, 926 F.Supp. 1002, 1017 (D.Kan.1996); *cf. Ortega v. IBP, Inc.*, 255 Kan. at 518, 874 P.2d 1188 (After noting that the plaintiff must prove a causal nexus between the employee's protected activity and the employer's decision to terminate, the Kansas Supreme Court referred to the burden-shifting scheme from *McDonnell Douglas* as the approach it utilizes in discrimination and free speech employment cases). Under the burden shifting approach, a prima facie case raises " 'a rebuttable presumption' " of a retaliatory intent. *See Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir.1994) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir.1988)). The burden of production now shifts to the defendant to rebut the presumption by offering a legitimate, non-retaliatory motive for the discharge. If rebutted, the presumption drops out of the case, and the plaintiff must carry the full burden of persuasion of proving by a preponderance of the evidence, which is clear and convincing in nature, that the defendant acted with retaliatory intent. *Ingels*, 42 F.3d at 621.

■ To establish a prima facie case of retaliatory discharge under Kansas law, a plaintiff must produce evidence demonstrating: (1) that the plaintiff filed a claim for workers' compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of the plaintiff's compensation claim or the fact that

the plaintiff had sustained a work-related injury for which he might file a future claim for benefits; (3) that the employer terminated the plaintiff's employment; and (4) that a causal connection existed between the protected activity or injury, and the termination. *Sanjuan v. IBP, Inc.*, 160 F.3d at 1298; *Robinson v. Wilson Concrete Company*, 913 F.Supp. 1476, 1483 (D.Kan.1996); *Huffman v. Ace Elec. Co., Inc.*, 883 F.Supp. 1469, 1475 (D.Kan.1995); *Rosas v. IBP, Inc.*, 869 F.Supp. 912, 916 (D.Kan.1994).

## ARGUMENTS

The plaintiff alleges that the defendant fired her as a result of absences necessitated by her work-related injury and that the defendant knew or should have the known at the time that the absences were due to a work-related injury. The defendant counters that it did not know and did not have reason to know the plaintiff's absences were due to a work-caused injury because the plaintiff did not comply with the defendant's policy which required a physician's note documenting the work-caused reason for the absence. The defendant further argues that it fired the plaintiff for violation of its attendance policy and that the plaintiff is unable to prove otherwise.

The defendant states the issue as being whether an employer can require an employee to provide medical certification that an absence is due to a work-caused condition:

> To avoid these (sic) very type of disputes regarding the cause for an absence, IBC requires medical documentation. The issue for this Court to determine is whether IBC can require its employees to provide IBC with medical certification in order to establish that an absence is due to a work caused medical condition. Accordingly, a ruling for Bausman and against IBC in this case would lead to a rule of law in Kansas which would allow an

226 Kan. 70, 78, 596 P.2d 816 (1979) (cita- tions omitted).

employee who has been injured at work to be absent at any date in the future with impunity simply by saying that the reason for the absence is because of the earlier work injury. Such a ruling would result in employees who have been injured at work selecting when and if they wish to report to work without providing employers with any recourse. (Dk.49, p. 12).

... To attempt to comply with Kansas law and to avoid endless and innumerable disputes regarding an employee's or a supervisor's opinions regarding the cause for an absence, IBC has an unwritten practice which simply requires that the employee submit a doctor's slip establishing that the absence is due to a work caused medical condition. The slip is available to the employee without cost because, if the condition is work caused, the workers' compensation proceedings pay for any related medical expense.

Thus, the Court has to decide whether, in all situations, a Kansas employer must accept an employee's assertion that an absence is due to a work caused medical condition even where, as here, the alleged condition has been fully treated, the employee has been released to work without restriction, and the employee, in some cases, has provided medical slips which, on their face, are wholly unrelated to the work caused medical condition. If the Court answers that question in the affirmative, Kansas employers will have to excuse the absence of any employee who, at any time, has had a work caused medical condition simply if the employee alleges that the absence somehow related to the condition.... Those cases do not establish or suggest Bausman's position that, once an employee has incurred an alleged work related medical condition, an employer does not have rights and that, in those circumstances, an employee does not have responsibilities. (Dk.53, pp. 16–17).

.... Instead of subjectively deciding who to believe and who not to believe, IBC's practice applies an objective standard which only requires that the employee submit a doctor's note which ties the absence to a work caused medical condition. The Court knows and IBC's experience proves that it is not difficult for an employee to obtain a doctor's slip. (Dk.38, p. 18).

The plaintiff posits that Kansas law simply precludes an employer from firing an employee for absences which the employer knows or has reason to know are the result of work-related injuries. The plaintiff accuses the defendant of advocating a change in the law that would require employees to prove by medical evidence that their absences are caused by work-related injuries. Like the defendant, the plaintiff makes her own policy arguments:

In this case, plaintiff submits to the court that it would be impossible for an employee to obtain a doctor's report retroactively providing that an employee went home early or was absent on a particular day because of a work-related injury. The practicalities of that would be that an employee, in order to see a physician, would need an appointment that may require several days. Plaintiff also submits that common sense dictates that once an employee was off work during a period of time and a doctor sees that employee several days later that it would (sic) impractical, perhaps inappropriate, and most doctors would be unwilling to write a statement saying that an employee went home early or did not work on a particular date because of a work related injury.

....

.... Similarly, in this case, defendant argues that it fired Ms. Bausman because she did not prove, through medical evidence, that her absences were due to her work-related injuries. Nothing in Kansas law allows an employer to circumvent the law by imposing requirements that exceed the boundaries of the law. (Dk.46, pp. 29, 31)

Therefore, under Kansas law a work related injury takes an employee out of

the employment at will arena and the employee becomes a member of a protected class. It must be noted that it is the injury that gives rise to the protection. Subsequent to the injury, an employer cannot penalize the employee for exercising rights under the Kansas Workers' Compensation Act. (Dk, 56, p. 3).

Besides their general policy arguments, neither side provided the court with much legal analysis other than to cite the general rule stated in *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 752 P.2d 645 (1988); explained in *Rowland v. Val–Agri, Inc.*, 13 Kan.App.2d, 149, 153–54, 766 P.2d 819, *rev. denied*, 243 Kan. 780 (1988); applied in *Pilcher v. Board of Wyandotte County Comm'rs*, 14 Kan.App.2d 206, 215, 787 P.2d 1204, *rev. denied*, 246 Kan. 768 (1990); and analyzed in *Ramirez v. IBP, Inc.*, 913 F.Supp. 1421, 1431–37 (D.Kan. 1995), *aff'd*, 145 F.3d 1346 (10th Cir. May 21, 1998) (table). None of these cases squarely address the unique issues raised here.

## ANALYSIS AND DISCUSSION

In arguing for summary judgment, both sides look to the rule stated in *Coleman v. Safeway Stores, Inc.*:

In this case, it was undisputed that Safeway could have terminated Coleman's employment under the applicable attendance policy if she had accrued six infractions. The district court [on a summary judgment motion] correctly decided that any absences caused by her work-related injury should not be counted against Coleman. Allowing an employer to discharge an employee for being absent or failing to call in an anticipated absence as the result of a work-related injury would allow an employer to indirectly fire an employee for filing a workers' compensation claim, a practice contrary to the public policy of this state as decided in *Murphy v. City of Topeka*. Other jurisdictions have also recognized that it is a violation of public policy and workers' compensation law to discharge an employee for absences due to work-related injuries. *See, e.g., Lo Dolce v. Regional Transit Service, Inc.*, 77 A.D.2d 697, 429 N.Y.S.2d 505 (1980) [*disapproved of by Duncan v. New York State Developmental Center*, 63 N.Y.2d 128, 470 N.E.2d 820, 481 N.Y.S.2d 22 (1984)]. Safeway's claim that Coleman was not discharged for absences, but for failing to call in to report absences, is not persuasive given the fact that Coleman was being treated by a company's physician who provided reports to Safeway regarding Coleman's condition.

242 Kan. at 815–16, 752 P.2d 645. Coleman suffered a work-related injury on June 14, 1984, was treated for this injury by Safeway's physician, and underwent surgery for this injury on September 19, 1994, which required her to be absent from work. While off work, the plaintiff was under the care of Safeway's physician. In August of 1984, Safeway adopted a new attendance policy which required all employees who were going to miss work to call in one-half before their shift. Six infractions of the policy resulted in termination. Safeway assessed infractions against Coleman for failing to call in daily to report her absences, even though she was under the care of Safeway's physician. When Coleman returned to work, Safeway terminated her saying that she had accrued six infractions. Coleman filed suit alleging she was wrongfully terminated as a result of her workers' compensation injury. The district court discounted Coleman's work-related absences but concluded that Coleman still had sufficient infractions for termination. As quoted above, the Kansas Supreme Court reversed holding that the district court had properly discounted those work-related absences but had erroneously decided a genuine issue of material fact as to the number of other infractions.

After *Coleman*, courts have struggled to define the purpose and operational limits for the rule stated there. In *Rowland v. Val–Agri, Inc.*, 13 Kan.App.2d 149, 766

P.2d 819 (1988), the plaintiff was fired pursuant to the employer's policy that authorized termination of employees who took six consecutive months' leave for any reason. The Court of Appeals distinguished *Coleman* on the basis that the plaintiff in *Coleman* was able to return to her job and restated the rule there as applying "when the worker is able to perform his or her work." 13 Kan.App.2d at 153–54, 766 P.2d 819. Though professing that its holding did not limit the *Coleman* decision, the *Rowland* court essentially recognized a circumstance when an employer may lawfully terminate an employee for absences due to a work-related injury.[3]

In *Pilcher v. Board of Wyandotte County Comm'rs,* 14 Kan.App.2d 206, 215, 787 P.2d 1204, *rev. denied,* 246 Kan. 768 (1990), the district court's jury instructions failed to recognize that a retaliatory discharge claim may exist though no workers' compensation claim was ever filed before the adverse employment action:

> The jury should have been instructed on the "rest of the story" that, even though no claim had been filed, an employee may not be terminated for absences due to a work-related injury which might form the basis for a workers' compensation claim in the future. A termination on that basis would be a retaliatory discharge based upon the possibility of a workers' compensation claim being filed in the future for which retaliatory discharge Pilcher was entitled to damages.

Significant in *Pilcher* is that the court equates the employer's termination of an employee for absences due to a work-related injury with an employer's discharge in retaliation for the employee possibly filing a workers' compensation claim.

The Kansas Supreme Court in *Ortega* summarized the holding in *Coleman* in these terms: "Thus, even where the em-

ployee had not yet filed a workers compensation claim, an employer is prohibited from firing an employee who is absent from work due to a work-related injury and who might file a workers compensation claim." 255 Kan. at 516, 874 P.2d 1188. Like the Kansas Court of Appeals in *Pilcher,* the Kansas Supreme Court saw the rule in *Coleman* as addressing the situation where an employee has not yet filed a workers' compensation claim but the employer is retaliating because the employee is injured and might file a claim.

This court issued a lengthy decision in *Ramirez* struggling with the rule as stated in *Coleman.* Rather than retreading water already covered, the court will only highlight several of the more important conclusions reached in that decision:

> The Kansas Supreme Court makes unmistakably clear in *Ortega* that retaliatory discharge is a tort committed only when the employer discharges the employee for an improper reason.
>
> . . . .
>
> The court admits the actual language found in *Coleman* readily submits to an interpretation that an employer, regardless of knowledge or intent, may not discharge an employee for absences caused by job-related injuries. To accept unconditionally this interpretation would contradict the *raison d'etre* for this tort. From *Murphy* to *Coleman* to most recently in *Ortega,* the Kansas appellate courts have stressed that this tort exception to the employment-at-will doctrine was developed to address employers' improper motives for firing employees in violation of public policy. The mere act of firing an injured employee for excessive absences or for a violation of a absenteeism policy does not implicate an improper retaliatory motive, particularly when the employer does not

---

**3.** By the terms of *Rowland,* a defendant employer is not liable if it: "(1) discharges plaintiff pursuant to a neutral policy requiring termination; (2) employment is not conditioned on termination of a workers compensa-

tion claim; and (3) plaintiff is unable to perform his previous job." *Barnard v. ADM Milling Co., Inc.,* 987 F.Supp. 1337, 1344 (D.Kan.1997) (citation omitted).

even know that one or more of the absences were due to work-related injuries. Consistent with *Gaddy* and *Mitchell*, the court holds that the plaintiff may not recover for retaliatory discharge unless she proves that at the time of her discharge the defendant knew or should have known the absences for which the plaintiff was being fired were the result of her work-related injury.

This leaves the question whether the plaintiff must prove a retaliatory intent or causal nexus and, if so, what must be proved. Again, the court simply does not believe the Kansas Supreme Court intended in *Coleman* to ignore the very essence of the retaliatory discharge exception and create a tort based only an employer's **non-retaliatory** application of an absenteeism policy. Though recognizing that an employer can have an unlawful retaliatory motive for discharging an employee even before the employee's claim for workers' compensation benefits is actually filed, the court in *Coleman* did not articulate any plain statement of that motive. The language used in *Coleman* retains some of its force if read to mean that an employer violates public policy when it discharges an employee in retaliation for absences caused by work-related injuries. According to *Pilcher*, such retaliation is based upon the possibility of a workers' compensation claim being filed. 14 Kan. App.2d at 215, 787 P.2d 1204. Consequently, the court holds that the plaintiff may not recover for retaliatory discharge unless she proves that the defendant discharged her because of absences caused by work-related injuries for which she might file a claim for workers' compensation claim.

913 F.Supp. at 1435, 1436–37 (emphasis added). In short, the court attempted to recast the *Coleman* rule into what a plaintiff must prove for a prima facie case of retaliatory discharge. To prove a causal connection between her injury and her termination, the plaintiff must demonstrate "that at the time of her discharge the defendant knew or should have known the

absences for which the plaintiff was being fired were the result of her work-related injury." 913 F.Supp. at 1436. The court further recognized that the plaintiff cannot recover unless ultimately successful in proving that the defendant retaliated against her because she had sustained a work-related injury for which she might file a claim for workers' compensation. *Id.* at 1436–37. The Tenth Circuit affirmed the judgment in *Ramirez* finding sufficient evidence for a reasonable jury to conclude that the plaintiff "proved by a preponderance of clear and convincing evidence that IBP terminated her because she sustained work-related injuries." *Ramirez v. IBP, Inc.*, 145 F.3d 1346, 1998 WL 257161, at *2 (10th Cir. May 21, 1998).

After the *Ramirez* decision, a different panel of the Tenth Circuit issued an unpublished decision reversing a summary judgment order against an employee who had brought a retaliatory discharge claim under Kansas law. *Rodgriguez v. IBP, Inc.*, 153 F.3d 728, 1998 WL 426797 (10th Cir. July 20, 1998). In this case, the employee was injured on the job in April of 1990, subsequently filed a workers' compensation claim in January of 1991, and worked a variety of light duty jobs until released for his regular job in January of 1992. Later in January, the employee told the personnel manager that he could not do his assigned work. The manager offered other jobs which the employee declined. The manager told the employee that he could go home until he felt able to work but that his leave was without pay. The manager also reminded the employee to call in before his shift for every day that he was not working. The employee accumulated three unexcused absences based on his failure to call in every day while he was off work. The employer terminated him for these absences under its attendance policy. In relevant part, the Tenth Circuit held:

Rodriguez contends evidence that IBP terminated him while he was absent due to a work-related injury demonstrates retaliation for his filing a workers' com-

pensation claim sufficiently to withstand summary judgment. The parties dispute how *Coleman* should be applied in this case. IBP contends *Coleman* does not apply to this situation because Rodriguez had a medical release to return to work. It argues under *Coleman*, only absences caused by work-related injuries should not be counted against the employee and Rodriguez's medical release proves his injury did not cause his absence. While we agree with IBP that Coleman requires absences to be caused by a work-related injury, we do not agree that as a matter of law, a medical release proves a subsequent absence is not the result of a work-related injury. Rodriguez testified his injury caused his absences and IBP personnel admitted they knew he was absent because he claimed his work-related injury prevented him from working. Thus, there is a factual dispute regarding the cause of Rodriguez's absences that cannot be resolved on the summary judgment record before us.

IBP contends Rodriguez' violation of its neutral absenteeism policy by accumulating three unexcused absences and not his workers' compensation claim was the reason for his discharge. However, Rodriguez testified in his deposition that he called in on two of the three days in question and he did not call in the other day, a Saturday, because he left work early on Friday due to pain from his injury and his supervisor told him to call in on the following Monday. Whether Rodriguez violated the policy is a disputed question of fact. Moreover, IBP's argument is flawed because *Coleman* prohibits terminating an employee for failing to call in anticipated absences due to a work-related injury because that would allow an employer to indirectly fire an employee for filing a workers' compensation claim. *Coleman,* 752 P.2d at 652. As in *Coleman,* IBP knew why Rodriguez was absent. (footnoted omitted). We conclude therefore that under *Coleman,* IBP's stated reason for discharging Rodriguez violates Kansas public policy.

1998 WL 426797, at *3. The panel explains in an accompanying footnote that they consider the "critical issue" to be "whether the employer knew the employee was absent due to a work-related injury. IBP knew Rodriguez claimed his work-related injury prevented him from doing the work IBP offered and that was why he was absent." 1998 WL 426797, at *4 n. 1. In effect, the Tenth Circuit here reads Coleman to preclude employers from justifying terminations under an absenteeism policy for absences they know are due to a work-related injury. This decision also stands for the proposition that a question of material fact will exist as to the employer's knowledge if the employee claimed at the time that her absences were due to a work-related injury.

As demonstrated by the decisions already discussed, courts have found it difficult to apply the *Coleman* rule, and it is no simple task here either. As quoted above, the defendant IBC offers several policy arguments that are quite sound, if not compelling, for why an employer should be able to have an absenteeism policy that requires employees to provide a physician's note which links the absence to a work-caused medical condition.[4] Neutral on its face and by its operation, this policy does not have the earmarks of a tool intended for pretextual retaliation. Nonetheless, if *Coleman* is to be applied as held

---

4. It should be noted that in *Coleman* the employer's physician was treating the plaintiff and providing the employer with reports regarding the plaintiff's condition during the time she was off work. 242 Kan. at 806, 816, 752 P.2d 645. Thus, the employer in *Coleman* knew as an undisputed matter of fact and medical opinion that the plaintiff was absent because of her work-related injury.

Under those well-defined circumstances, the Kansas Supreme Court had no reason to consider an employer's interests in having some medical evidence of the reason for an employee's absences when the employee already had undergone medical treatment for the work-related injury and been released for work without restriction.

in *Rodriguez*, IBC faces tort liability whenever it enforces the policy against employees who claim at the time that their absences are due to a work-related injury. Nor can IBC, as a matter of law, deny knowledge of an employee's claimed reason for an absence by simply pointing to their absenteeism policy that requires some objective proof.[5] Under this approach, employees who have suffered work-related injuries can effectively insulate themselves from being disciplined for disobeying personnel rules on absenteeism by simply asserting their absences are due to work-related injuries. In short, IBC's practice of requiring a physician's note would be rendered unenforceable and thereby ineffective.

Should policies or practices, like IBC's, be considered for an exception to *Coleman* in much the same way as the Kansas Court of Appeals did in the *Rowland* decision? Considering, let alone crafting, exceptions that function as a matter of law places a court in the uncomfortable position of weighing competing policy interests within the peculiar framework of Kansas workers' compensation laws. The Kansas Court of Appeals was in that difficult position when it decided "whether Kansas public policy, as derived from the Workers Compensation Act, *requires* employers to attempt to find alternative employment and/or modify job functions to accommodate workers injured on the job before terminating them" and whether any such duty should be "made part of the public policy which supported the creation of the tort of retaliatory discharge" as to subject an employer to tort liability. *Griffin v. Dodge City Cooperative Exchange*, 23 Kan. App.2d 139, 147, 148, 927 P.2d 958 (1996),[6] *rev. denied*, 261 Kan. No. 4, p. V (1997). The court does not believe that the Kansas Supreme Court ever intended the language in *Coleman* to function as some general rule of automatic liability subject only to those specific exceptions subsequently created. Such a piecemeal approach would put both employers and employees in some unfair and unpredictable circumstances.

Rather than the expansive reading of *Coleman* followed in *Rodriguez* or the policy-making approach offered in *Rowland* and *Griffin*, this court chooses the path mapped out in *Ramirez* which places the rule in *Coleman* within the procedural framework of a common retaliatory discharge claim. Retaliatory discharge is an intentional tort; it is committed "only when the employer discharges the employee for an improper reason." *Ramirez*, 913 F.Supp. at 1435. When first recognized in *Murphy v. City of Topeka*, 6 Kan.App.2d 488, Syl. ¶ 7, 630 P.2d 186 (1981), the tort made an employer liable for discharging "an employee *in retaliation for* filing a workmen's compensation claim." In *Coleman*, the court expanded the tort to circumstances "where the employee had not yet filed a worker's compensation claim" by making an employer liable for discharging an employee in retaliation for being "absent from work due to the work-related injury." *Ortega v. IBP, Inc.*, 255 Kan. at 516, 874 P.2d 1188. The Kansas Supreme Court in *Coleman* wanted to prevent employers from preemptively firing injured employees based on a common circumstance resulting from an injury, namely

---

**5.** Both *Ramirez* and *Rodriguez* recognize that an employee's testimony that she told her supervisors the reason for her absences is some evidence the employer knew the employee was absent because of a work-related injury. By arguing that it does not have knowledge of the cause for an absence until an employee complies with its absenteeism policy, the defendant essentially wants the court to eliminate any evidentiary weight from the employee's testimony on this point. The defendant cites no legal authority for its position that an employer should have the authority under this tort to define knowledge of the cause for an employee's absence and to limit the means for acquiring that knowledge.

**6.** The Kansas Court of Appeals aptly observed that "[t]his case is an example of the problem in interpreting *Rowland* broadly." 23 Kan. App.2d at 148, 927 P.2d 958. Ironically, *Rowland* was a case that stemmed from interpreting *Coleman* too broadly.

absences, and thereby accomplishing indirectly what they were precluded from doing directly. In other words, the Kansas Supreme Court wanted to prohibit an employer from retaliating against employees who are injured at work and who might file a workers' compensation claim. *See Ortega,* 255 Kan. at 516, 874 P.2d 1188; *Pilcher,* 14 Kan.App.2d at 215, 787 P.2d 1204. Thus, under the public policy embodied in Kansas workers' compensation laws, it is unlawful in Kansas for an employer to retaliate against an employee because she has filed a workers' compensation claim or because she was injured at work and might file a workers' compensation claim. *cf. Sanjuan v. IBP, Inc.,* 160 F.3d at 1298; *Ramirez v. IBP, Inc.,* 145 F.3d 1346, 1998 WL 257161, at *2; *Newell v. K-Mart Corp.,* 35 F.Supp.2d 1312 (D.Kan.1999).

Because an employer rarely announces retaliation as its motive for an adverse employment action, an employee often must rely on a prima facie case shown by circumstantial evidence, just like plaintiffs in other employment discrimination and retaliation cases. *Marinhagen v. Boster, Inc.,* 17 Kan.App.2d 532, 540, 840 P.2d 534 (1992), *rev. denied,* 252 Kan. 1092 (1993). Proof of a prima facie case creates a rebuttable presumption of retaliatory intent. The plaintiff Bausman here has established a prima facie case of retaliatory discharge. Prior to her termination, she had filed a claim for workers' compensation benefits, and IBC was aware of her claim. As proof of the causal connection element, Bausman comes forth with evidence that after she filed her claim the defendant assessed absences which it knew or should have known were due to a work-related injury. The court believes the summary judgment record reflects a genuine issue of material fact concerning the defendant's knowledge regarding the cause of one or more of these absences.

 The burden of production is now with the defendant to rebut the presumption of retaliatory intent by offering a legitimate, non-retaliatory motive for the discharge. IBC asserts it fired Bausman because she had accrued excessive absences and, prior to her termination, had not submitted as required under IBC's practice and policy a physician's note which documented any of the absences as being due to her work-related injury. IBC maintains that it had a reasonable practice for determining when an employee was absent due to a work-caused medical condition and a lawful policy for excusing those absences when a sufficient physician's note was presented. In charging the plaintiff with these absences, IBC argues it rightfully relied on the plaintiff's apparent choice not to submit a proper physician's note.

 "Under Kansas law, an employer is permitted to discharge an injured employee pursuant to a neutral attendance policy, even if the employee has a work-related injury or has filed a workers compensation claim." *Velazquez v. IBP, Inc.,* 99 F.3d 1151, 1996 WL 594280, at *2 (10th Cir. Oct.17, 1996) (Table) (citing *Sanjuan v. IBP, Inc.,* 919 F.Supp. 378, 380–81 (D.Kan.1996)); *see also Chaparro v. IBP, Inc.,* 104 F.3d 367, 1996 WL 733771, at *7 (10th Cir. Dec.24, 1996) ("As Kansas law recognizes, an employer may terminate an employee pursuant to a neutral attendance policy—even where the employee is injured and the employer cannot provide suitable work." (citation omitted)); *Lyden v. Hill's Pet Nutrition, Inc.,* 907 F.Supp. 343, 347 (D.Kan.1995) (and cases cited therein). "[U]nder Kansas law, employees are not vested with an absolute guarantee of continued employment merely because an injury was sustained in the course of employment, we must reject plaintiffs' contention that Kansas would not allow *any* attendance policy to be the basis of an employee's termination when the absences are caused by injury compensable under workers' compensation law." *Raymond v. Archer Daniels Midland Co.,* 762 F.Supp. 901, 905 (D.Kan.1991). "Courts are concerned, therefore, with retaliatory motive in cases such as these, and a neutral ab-

senteeism policy lacks, in general, the illegal motive which plaintiff must establish. For this reason, we conclude that there should be no per se rule that a discharge for absenteeism is an illegal reason for the discharge." *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wash.2d 46, 74, 821 P.2d 18, 31 (1991). As long as the absenteeism policy is neutral on its face and in its application, punitive action taken for violations of the policy is not retaliatory.

IBC is adamant that its policy and practice at issue is necessary because under Kansas law the employer must determine when an employee's absence is due to a work-caused medical condition. Unequipped to reach its own medical opinions and reluctant to make an employee's credibility in these circumstances a matter to be disputed and always judged, IBC established "a practice to assist it in determining whether the absence was due to a work-caused medical condition." (Dk.38, p. 15). IBC contends that its policy and practice is particularly reasonable in its enforcement here. IBC had known for years about Bausman's work-related injury. Bausman's physicians released her for work without any restrictions over one year before she was terminated. Bausman conceded she had been absent on occasion for reasons unrelated to her work-related injury. IBC was not receiving any reports from its insurer or from Bausman's workers' compensation doctor that she was being actively treated for her work-cause medical condition. In sum, IBC argues it was not using its absenteeism policy as a pretextual tool to retaliate against an injured employee who had yet to file a workers' compensation claim. From the facts discussed and the law summarized above, the court concludes that IBC's stated ground for terminating Bausman is a legitimate, non-retaliatory reason for discharge even though one or more of Bausman's absences may have been due to a work-related medical condition. This court believes a contrary position would effectively insulate from Bausman from being disciplined for not obeying these reasonable personnel rules pertaining to absenteeism.

Once a defendant articulates a legitimate reason, "the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321 (10th Cir.1997). "To avoid summary judgment, a plaintiff need not demonstrate that discriminatory reasons motivated the employer's decision." *Id.* at 1321–22. In doing so, the plaintiff can rely on evidence showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d at 1323 (internal quotation marks and citation omitted). Pretext can be shown by proving that the employer's stated reason lacked a basis in fact, was not the "real reason" for the action, or did not warrant the particular adverse employment action. *Motley v. Tractor Supply Co.*, 32 F.Supp.2d 1026, 1038 (S.D.Ind.1998) (citations omitted). That the employer was mistaken or that others disagree with the employer's action does not prove mistake. " 'There is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment.' " *Schultz v. General Elec. Cap. Corp.*, 37 F.3d 329, 334 (7th Cir.1994) (quoting *Kralman v. Illinois Dept. of Veteran' Affairs*, 23 F.3d 150, 156 (7th Cir.), *cert. denied*, 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994)), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). Moreover, the plaintiff's "mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

This court is not sitting as some kind of "super-personnel department," free to second guess the propriety of an employer's business decision. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir.1998); *Branson*, 853 F.2d at 772. It is not our role to decide whether an employer's legitimate, nondiscriminatory reason was "wise, fair, or even correct, ultimately so long as it truly was the reason for the plaintiff's termination." *DeJarnette*, 133 F.3d at 299 (internal citation omitted). On the other hand, "[w]here the plaintiff must prove defendant's intent by circumstantial evidence, summary judgment is rarely appropriate." *Lyden*, 907 F.Supp. at 347 (citing *Marinhagen*, 840 P.2d at 540). Summary judgment remains appropriate when the plaintiff fails to present significantly probative evidence sufficient to create a triable issue on pretext. *Frohmader v. Wayne*, 958 F.2d 1024, 1028–29 (10th Cir. 1992).

The plaintiff's memoranda do not designate what evidence the court should consider at this stage of its analysis. Consequently, the court has indulged the plaintiff by piecing together her different arguments and evidence and presenting them for consideration now. First, the plaintiff points to the fact that IBC has no written policy embodying its practice of requesting medical certification for absences caused by a work-related medical condition. This fact would carry significant weight if there were other evidence that IBC did not uniformly follow this practice or its other related attendance policies or that IBC took measures or otherwise acted so as to keep employees injured on the job from learning of this requirement or practice. There is no such evidence of record. Without this additional evidence, it is a strain to infer much more than a mistake by IBC in not including this practice as part of its written absenteeism policy. The court does not consider this to be much, if any, circumstantial evidence of pretext.

Though never presented as a separate argument for pretext or retaliatory intent, the plaintiff did contest the defendant's factual statement that she knew of IBC's requirement to bring in a physician's slip for absences due to a work-related injury. Bausman's testimony on this point, however, is far from clear, direct, certain or unambiguous. At page thirty-five of her deposition, she denied understanding that she needed to bring a slip for absences due to a work-related injury, and she believed that the company was obligated to believe her representation. Despite this early deposition testimony about her general understanding of IBC's absenteeism policy, Bausman later testified as follows:

Q. Good. Well, okay, so you were telling him—or I guess you are telling the group in a meeting on May 2nd, 1994, in connection with Exhibit 17, that April 26th and April 28th were days that you said you were absent in connection with a work-related injury; is that correct?

A. Right.

. . . .

Q. That's what you said. You were discussing Exhibit 17, and you are telling Mr. Drum that April 25th and 28th shouldn't count because they were in conjunction with a work-related injury; is that correct?

A. Yes.

Q. Didn't Mr. Drum tell you that you had to bring in a doctor's note to give to the company?

A. I gave it to them after I came back.

Q. Who did you bring the doctor's note from?

A. Doctor Bernard.

(Dk. 39, Tab 1, Bausman Dep. at pp. 89–90).

Q. Excuse me. Let me restate the question. Do you know of any situation when a person was absent and did not bring in a doctor's slip and did not get a point under the policy?

A. No.

(Dk. 39, Tab 1, Bausman Dep. at pp. 95–96).

Q. Who did you tell that you were going to be absent starting on May 3rd, 1994?

A. I believe that was Todd Crook.

Q. What did you say to Mr. Crook and what did he say to you in that conversation?

A. I told him that I had called the doctor and talked to him about being sick quite a bit, and that he either told me that it was an ulcer due to the medication for my arm, and that would take about two weeks to get it healed. I told this to Todd, and he said, "Fine, you will need a doctor's slip."

Q. Did you have any objections to Mr. Crook asking you for a doctor slip in those circumstances?

A. No.

(Dk. 39, Tab 1, Bausman Dep. at p. 104).

Q. Then we look back at Exhibit 18, the habitual letter, and that shows that your next absence was May 25th, 1994, is that correct?

A. That's right.

Q. And who did you talk to on that occasion to say that you wouldn't be in?

A. I don't recall.

Q. And what did you tell the person when you said you wouldn't be in?

A. That I had been to the hospital, that I had had hives, and they told me I could not return to work until I had been home for twenty-four hours. I had a note, and I was to bring it in when I came in.

Q. What was your understanding of what difference the note would mean to you?

A. I don't know.

Q. Why did you tell the company in connection with May 25th, 1994, that you had a note and that you could bring it in, from your doctor?

A. It might save them harassing—you know, as far as making this telephone call, you know, I didn't want to do that anymore than I had to.

Q. Can you explain that?

A. Well, I just—at the time I called in for that I just didn't want to get into a lot of explaining, so I just threw that in, because they would have told me to do it anyway.

(Dk. 39, Tab 1, Bausman Dep. at pp. 111–12).

When it came to her specific absences and her conversations with her supervisors at the time, Bausman openly testified that she had been told repeatedly to bring physician's notes for absences due to work-related injuries. Moreover, her testimony further reveals that she understood IBC expected the same from her. The plaintiff submits no evidence that she ever complained during her employment about having to present physician's notes for absences caused by work-related injuries. Nor does she submit evidence that this requirement was discussed at either of her grievances over the warning of May 2, 1994, and the final warning of May 25, 1994. Under these circumstances, Bausman's general denial of knowledge is not clear and convincing evidence from which a person can reasonably infer pretext on the part of IBC.

Bausman contends IBC had no reason to disbelieve or dispute that she was absent for the reasons she gave. IBC responds that its policy must be applied uniformly to all employees so as to avoid the "endless and innumerable disputes regarding an employee's or a supervisor's opinions regarding the cause for an absence." (Dk.53, p. 16). IBC further points out that the circumstances of this case demonstrate the very need for such a policy. IBC emphasizes that Bausman's alleged work-caused medical condition had been claimed for years and had been the subject of medical treatment and accommodation over an extended period. Over a year before her discharge, Bausman's physicians released her for full duty work without any restrictions. During the period for which Bausman was assessed absences leading to her discharge, IBC did not receive any reports from its insurer or from Bausman's workers' compensation physicians regarding any active treatment of

her work-related medical condition. Bausman did submit several physician's notes, but they did not refer to any known work-caused medical condition, did not explain that the absences were due to any such condition, were not submitted by the physicians who had been treating her for this condition, and sometimes even said that the plaintiff need not be off work for her illness. Thus, the record demonstrates that IBC had reasonable cause for maintaining such a practice and for enforcing it here.

As for other evidence of pretext or retaliatory intent, Bausman points to the following evidence. Her testimony that just days before her discharge she had been confronted by Lincoln as to why she expected to keep her job after incurring absences "from time to time as a result of her work related injury." (Dk.46, p. 27).[7] Her testimony "that when she reported her work related injury she was being harassed." (Dk.46, p. 27).[8] Finally, Bausman refers to IBC's self-insured status and to IBC's different employee incentive programs.[9] The court does not find any of this evidence sufficient to sustain a reasonable inference of pretext or retaliatory intent.

"Discharging an employee for violation of an attendance policy, ..., is a less subjective reason than ... discharg[ing] ... [a plaintiff] for poor job performance." *Lyden v. Hill's Pet Nutrition,*

*Inc.,* 907 F.Supp. at 347; *Robinson v. Wilson Concrete Co.,* 913 F.Supp. at 1484. The evidence of record does not show the defendant to have enforced its absenteeism policy and practice against the plaintiff in a manner that was strict, unbending, or unreasonable. Her supervisors repeatedly told the plaintiff of the need for a physician's note and gave her more than adequate time following the absences to obtain and submit them. Grievance hearings were conducted on the two warnings during which IBC necessarily explained its reasons for issuing the warnings and the plaintiff was allowed to respond. The record does not show that at any time prior to her discharge the plaintiff even sought a physician's note that explained her absences as being due to a work-related injury. There is no evidence that the plaintiff ever submitted adequate medical certification for one of these absences and the defendant refused to consider it, lost it, altered it, or otherwise ignored it. Rather, the record stands uncontroverted that if the plaintiff had submitted such physician's notes, then one or more of her absences would have been excused.

In sum, the court finds no genuine dispute of material fact as to whether IBC's proffered reasons were unworthy of belief. On the record as it stands, *no reasonable jury could find by a preponderance of evidence which is clear and convincing that*

---

7. The plaintiff does not offer any citation to the record to support her argument that Lincoln confronted her. The court independently reviewed those portions of the plaintiff's deposition submitted and found testimony describing the grievance meeting on June 22, 1994. "They had asked me what—why I should keep my job with all these absences, when nobody else would be allowed to." (Dk. 39, Tab 1, p. 129). This testimony does not include any confrontational comments specifically referencing absences caused by a work-related injury.

8. The plaintiff testified that she had prepared a document in July of 1992 stating that she had been hurt on the job, because she was "being harassed" and this protected her. The plaintiff submits no further testimony or evi-

dence identifying or describing what actions were being taken in 1992 that she considered to be harassment. The court cannot draw a reasonable inference of retaliatory intent from the plaintiff's mere opinion that harassment occurred when there is no explanation given or other evidence offered to support it.

9. Though such matters are "circumstantial evidence relevant to ... [the employer's] motivation to discourage the reporting of injuries and/or reduce the cost of injuries," *Sanjuan v. IBP, Inc.,* 160 F.3d at 1298, IBC's use of such programs, in itself, is not much evidence of retaliatory intent, for these same programs also plainly serve the employer's legitimate interest in encouraging employee safety in the workplace.

IBC's articulated business reasons were unworthy of belief and were not the real reasons for Bausman's discharge. In short, the court concludes that the plaintiff would be unable to prove at trial that IBC terminated Bausman because she had filed a workers' compensation claim and/or had sustained or aggravated a work-related injury for which she might seek workers' compensation benefits. Thus, the court finds that the defendant is entitled to summary judgment.

IT IS THEREFORE ORDERED that the plaintiff Bausman's motion for partial summary judgment (Dk.35) is denied;

IT IS FURTHER ORDERED that the defendant IBC's motion for summary judgment (Dk.37) is granted; and

IT IS FURTHER ORDERED that the plaintiff Bausman's motion to strike (Dk.44) the affidavit of Robert Lincoln (Dk.39, Ex. 6) is denied.

## MEMORANDUM AND ORDER

This retaliatory discharge case comes before the court on the plaintiff Cynthia M. Bausman's ("Bausman") motion to alter and amend judgment (Dk.61). On April 30, 1999, the court filed a lengthy order that, *inter alia,* denied Bausman's motion for partial summary judgment (Dk.35) and granted the defendant Interstate Brands Corporation's ("Interstate Brands" or "IBC") motion for summary judgment (Dk.37). *Bausman v. Interstate Brands Corp.,* 50 F.Supp.2d 1028 (D.Kan., 1999). In her motion and supporting memorandum, the plaintiff argues the summary judgment ruling is contrary to state law and Tenth Circuit precedent.

## STANDARDS GOVERNING MOTION TO RECONSIDER

As the rules of this court provide, "[a] motion to reconsider shall be based on (1) an intervening change in controlling law, (2) availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice." D.Kan. Rule 7.3. "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. General Motors Corp.,* 846 F.Supp. 1482, 1483 (D.Kan.), *aff'd,* 43 F.3d 1484 (10th Cir. Dec.21, 1994) (table). The decision whether to grant or deny a motion to reconsider is committed to the court's sound discretion. *Hancock v. City of Oklahoma City,* 857 F.2d 1394, 1395 (10th Cir.1988).

## DISCUSSION

The plaintiff's motion does little more than rehash the arguments and issues already advanced in the summary judgment proceedings. The plaintiff does not refer to any intervening change in controlling law or to the availability of new evidence. Rather, she simply reiterates her summary judgment arguments as now showing that the court's ruling is clearly contradicted by Kansas statute and case law.

By omitting its context, the plaintiff overstates the court's ruling as allowing "employers to fire injured employees that are absent from work because of a work related injury." (Dk.62, p. 5). The court's ruling allows employers to enforce a neutral absenteeism policy, like the one here, against employees who are absent due to a work-related injury, so long as the employer is not enforcing the same in retaliation for the employee seeking relief under the workers' compensation or having been injured at work. This ruling is consonant with the irrefutable proposition that retaliatory discharge is an intentional tort that is committed "only when the employer discharges the employee for an improper reason." *Ramirez v. IBP, Inc.,* 913 F.Supp. 1421, 1435 (D.Kan.1995), *aff'd,* 145 F.3d 1346 (10th Cir. May 21, 1998) (table).

The plaintiff remarks that the "employers [who] engage in retaliatory conduct rarely broadcast their intentions to the world" and that they "try to accomplish their aims by subtle rather than obvious methods." (Dk.62, p. 5). In its order, the court recognized that "an employer rarely announces retaliation as its motive for an adverse employment action" and that a

plaintiff often must resort to circumstantial evidence and use the *McDonnell Douglas* burden-shifting scheme to prove retaliation. (Dk.59, pp. 36–37). Moreover, the court held that the causal connection element of the prima facie case was met with evidence that after the plaintiff "filed her claim the defendant assessed absences which it knew or should have known were due to a work-related injury." (Dk.59, p. 37). Though an employer's retaliatory intent often may be difficult to prove, it still remains the *raison d'etre* for this tort of retaliatory discharge.

The plaintiff sounds an alarm that "if a plaintiff is required to medically prove that an absence from work was caused by a work related injury, the public policy of the State of Kansas that seeks to protect injured employees would be eviscerated." (Dk.62, p. 6). "This Court's ruling gives employers a green light to fire injured employees with impunity for absences from work that are necessitated by work related injuries ànd who cannot prove medically that the absence from work was caused by a work related injury." (Dk.62, p. 8). The plaintiff also maintains such a result runs counter to the policy embodied in K.S.A. 44–510c(b)(2). The plaintiff also complains that there is no "exactitude in medicine" and that there will be additional litigation resulting when a personal physician and a company physician disagree over the proper course of medical care.

The alarm sounded by these arguments has little, if anything, to do with this case. First, the terms of K.S.A. 44–510c(b)(2) are "clearly limited to the purpose of determining *whether* an employee has a '[t]emporary total disability' for purposes of receiving benefits." *Griffin v. Dodge City Cooperative Exchange*, 23 Kan. App.2d 139, 144, 927 P.2d 958 (1996), *rev. denied*, 261 Kan. No. 4, p. V (1997). The public policy embodied in that statute is not contradicted, undermined or even necessarily implicated by the defendant's neutral attendance policy or the court's ruling here. Second, the court's ruling does not add any element regarding medical proof of the cause for an absence. Third, the defendant's attendance policy here did not require notes from any particular physician, such as the designated worker's compensation physician or the company physician. Nor does this case involve any issue of the defendant disputing or questioning the plaintiff's personal physician's medical opinion as to the cause of the plaintiffs absences.[1] Forced by case law to decide when an employee's absence is due to a work-caused medical condition, IBC fashioned a policy that enabled it to make this determination without always being forced to judge an employee's credibility regarding absences and without being required to reach its own medical opinions as to the cause of absences. Indeed, the record stands uncontroverted that the defendant interpreted and enforced its attendance policy consistent with this stated purpose for the policy.

The plaintiff's last attack is that the court's ruling is contrary to its own decision in *Ramirez v. IBP, Inc.*, 913 F.Supp. 1421, 1435 (D.Kan.1995), *aff'd*, 145 F.3d 1346 (10th Cir. May 21, 1998) (table), and with the Tenth Circuit's decision in *Rodriguez v. IBP, Inc.*, 153 F.3d 728, 1998 WL 426797 (10th Cir. July 20, 1998). Having addressed both of these decisions in its summary judgment order, the court will not belabor this decision with further comments. In short, the court's ruling rests on the procedural framework most often used in other employment retaliation and discrimination claims where a plaintiff must prove intentional discrimination or retaliation. That this ruling appears contrary to one or more decisions is simply a

---

1. If the employer's attendance policy contained provisions which singled out and overburdened an employee injured at work, then such a policy arguably would not be neutral and this would be evidence of pretext. Likewise, if the employer's attendance policy has terms or is enforced in a manner that is incongruent with the employer's stated lawful purpose for the policy and that is indicative of a discriminatory intent, then this also would be evidence of pretext. The plaintiff presents no such evidence.

reflection of the courts'. difficulty with applying the fact-oriented rule from *Coleman v. Safeway Stores, Inc.,* 242 Kan. 804, 752 P.2d 645 (1988), rather than any conflict with the legal principles underlying the retaliatory discharge claim.

IT IS THEREFORE ORDERED that the plaintiff Bausman's motion to alter and amend judgment (Dk.61) is denied.