**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 11 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CYNTHIA M. BAUSMAN,

      Plaintiff-Appellant,

v.

INTERSTATE BRANDS
CORPORATION,

      Defendant-Appellee.

No. 99-3229

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 96-CV-4119-SAC)**

---

David O. Alegria, McCullough, Wareheim & Labunker, P.A., Topeka, Kansas, for
the Plaintiff-Appellant.

Leonard Singer (James R. Holland, II, with him on the brief) of Bioff Singer and
Finucane, LLP, Kansas City, Missouri, for the Defendant-Appellee.

---

Before **SEYMOUR**, and **PORFILIO**, Circuit Judges, and **JENKINS**, Senior
District Judge.[1]

---

**JENKINS**, Senior District Judge.

---

[1]The Honorable Bruce S. Jenkins, United States Senior District Judge for the District of
Utah, sitting by designation.

Plaintiff-Appellant Cynthia M. Bausman began her employment with Defendant-Appellee Interstate Brands Corporation ("IBC") on June 28, 1986. She worked at IBC until her discharge from employment on July 5, 1994. Ms. Bausman brought an action for wrongful discharge against IBC, alleging that IBC terminated her employment in retaliation for her filing of a workers' compensation claim, and that IBC did so in violation of the public policy of the State of Kansas. IBC contends that it discharged Bausman pursuant to a neutral attendance policy because of absences regarding which Bausman did not provide doctor's notes to confirm that her absence resulted from a work-related injury.

The action was brought within the district court's diversity jurisdiction, 28 U.S.C. § 1332, and Kansas law governs. The district court granted summary judgment in favor of IBC, and following the district court's denial of her motion to alter or amend its judgment, Ms Bausman appealed.

I

This court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. On appeal, the district court's grant of summary judgment is reviewed *de novo*, considering the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000). Summary judgment is proper if the record shows

-2-

"that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case. *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

## II

Under Kansas law, an employer cannot fire an employee in retaliation for that employee filing a workers' compensation claim; the filing of such a claim represents the protected exercise of a statutory right. *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981). The Kansas courts have reasoned that "[a]llowing an employer to discharge an employee for being absent . . . as the result of a work-related injury would allow an employer to indirectly fire an employee for filing a workers' compensation claim, a practice contrary to the public policy of this state . . . ." *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 816, 752 P.2d 645, 652 (1988). Consequently, "any absences caused by her work-related injury should not be counted against" Ms. Bausman by her employer. *Id.*

-3-

*Coleman* has been read to extend the protection of public policy to injured employees who have not yet filed a workers' compensation claim, preventing employers from preemptively discharging injured employees who would be likely to file statutory claims in the near future. *Ortega v. IBP, Inc.*, 255 Kan. 513, 516, 874 P.2d 1188, 1191 (1994).

## Burden of Proof

The rule, however, is not a matter of strict liability: "the plaintiff may not recover for retaliatory discharge unless she proves that at the time of her discharge the defendant knew or should have known the absences for which the plaintiff was being fired were the result of her work-related injury," an injury for which she has filed or might file a claim for workers' compensation. *Ramirez v. IBP, Inc.*, 913 F. Supp. 1421, 1436 (D. Kan. 1995), *aff'd mem*, 145 F.3d 1346 (10th Cir. 1998) (table). The burden rests upon Ms. Bausman to prove that IBC discharged her in retaliation for filing a claim under the Kansas Workers' Compensation Act. *Ortega v. IBP, Inc.*, 255 Kan. 513, 528, 874 P.2d 1189 (1994). Under Kansas law, she must prove a claim for retaliatory discharge "by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Ortega v. IBP, Inc.*, 255 Kan. 513, 528, 874 P.2d 1188 (1994). Evidence is *clear* if "it is certain, unambiguous, and plain to the understanding." *Id.* Evidence is *convincing* if "it is reasonable and persuasive enough to cause the

-4-

trier of fact to believe it."  *Id.* (citing *Chandler v. Central Oil Corp., Inc.*, 253 Kan. 50, 58, 853 P.2d 649 (1993)).

Ms. Bausman may recover upon "proving that the discharge was 'based on,' 'because of,' 'motivated by' or 'due to' the employer's intent to retaliate," but she does "not need to show that retaliation was the employer's sole motive or reason for the termination." *Sanjuan v. IBP, Inc.*, 160 F.3d at 1298 (quoting *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 146-148, 815 P.2d 72 (1991)).

### Burden-Shifting Approach

Because an employer rarely announces retaliation as its motive for terminating an employee, "Our Supreme Court has adopted a burden-shifting approach to analyze cases involving retaliatory discharge based on discrimination. We hold that the same analysis should be applied in workers compensation retaliatory discharge cases." *Rebarchek v. Farmers Cooperative Elev. & Mercantile Association of Dighton*, 28 Kan. App. 2d 104, 13 P.3d 17, 23 (2000), *review granted*, No. 82,662 (Kan. Feb. 6, 2001).  *See Robinson v. Wilson Concrete Co.*, 913 F. Supp. 1476, 1483 (D. Kan. 1996) (burden-shifting analysis applies in workers compensation discharge cases).  Proof of a prima facie case creates a rebuttable presumption of retaliatory intent.

To establish a prima facie case of retaliatory discharge under Kansas law, Ms. Bausman must produce evidence demonstrating: "(1) [that] he or she filed a claim for workers' compensation benefits, or sustained an injury for which [s]he might assert a future claim for such benefits;  (2) that the employer had knowledge of plaintiff's compensation claim, or the fact that [s]he had sustained a work-related injury for which the plaintiff might file a future claim for benefits;  (3) that the employer terminated the plaintiff's employment;  and (4) that a causal connection existed between the protected activity or injury, and the termination." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998) (citing *Chaparro v. IBP, Inc.*, 873 F. Supp. 1465, 1472 (D. Kan. 1995)).  *See Robinson v. Wilson Concrete Company*, 913 F. Supp. at 1483;  *Huffman v. Ace Elec. Co., Inc.*, 883 F. Supp. 1469, 1475 (D. Kan.1995);  *Rosas v. IBP, Inc.*, 869 F. Supp. 912, 916 (D. Kan.1994).  The requisite "causal connection" is the unlawful intent on the part of the employer to terminate the employee because the employee has filed a statutory claim, or has been injured and may file such a claim.

In this case, the critical factual question as to this element is whether IBC knew—or should have known—that Ms. Bausman was absent on each of the occasions for which she was being fired as a result of her work-related injury.

If a plaintiff has made her prima facie case, "the burden shifts to the defendant employer to show an articulate, non-retaliatory reason for the

discharge. *Rosas v. IBP, Inc.*, 869 F. Supp. 912, 916 (D. Kan. 1994)." *Sanjuan*, 160 F.3d at 1298. If the employer meets this burden, "the burden shifts back to the plaintiff but the plaintiff must show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act. *Ortega*, 874 P.2d at 1197-98." *Id.*

III

The district court summarized the uncontroverted material facts, including the following:

From June 28, 1986 through July 5, 1994, Cynthia Bausman worked for IBC at its bakery in Emporia, Kansas, where it produces snack cakes and related products.

IBC has a written attendance policy that applies to all employees and disciplines employees for absences without notification, tardiness, leaving early from work, and for excessive absences. An employee will receive a "charged absence" for not coming to work when scheduled, for leaving work early, and for being late to work by more than five minutes. Based on the number of absences during a six-month period, the policy imposes progressive discipline: (1) an oral warning after four absences; (2) a written warning after five absences; (3) a "decision day" off with pay after six absences; and (4) discharge after seven absences. IBC's policy also establishes an "habitual absentee" status for

-7-

employees who accrue eight absences during a twelve-month period: upon notification of being an "habitual absentee," an employee may be discharged if he or she is absent once more during the following six-month period.

The written IBC policy contains the following exception concerning absences for extended illness:

> Employees who phone in pending absences daily (more than (1) day) shall have each day of absence count as a single occurrence, unless the employee furnishes a physician's certificate documenting diagnosis, treatment, and the necessity for multiple days of absence. The Company may elect to count the multiple days of absence as a single occurrence.

(Dk. 39, Tab 9).

Though not appearing in its written attendance policy effective January 1, 1991, IBC apparently has followed a practice that did not charge employees with absences due to work-related injuries. Representatives of IBC's management had told Bausman of this practice. According to various IBC management personnel at the Emporia bakery, including Robert Lincoln, the personnel manager at this bakery and the individual in charge of administering IBC's attendance policies, IBC's practice was that it would not exempt absences as being caused by work-related injuries unless the employee provided a note from a physician stating that the absence was due to a work-related injury. Donald Wilson, IBC's production manager, testified that without this doctor's note, the employee would be charged

with an absence regardless of the employee's or the supervisor's opinion that the absence was due to work-related injuries. Ms. Bausman's supervisor, Brett Drum, testified that an employee complaining of a work-related injury would be allowed to leave work but that the employee would be charged with an absence unless the employee later provided a physician's note stating the absence was due to the work-related injury.

Nothing in IBC's written attendance policy requires a doctor's note to substantiate absence due to a work-related injury, or precluded management from excusing an absence as due to work-related injuries by accepting an employee's representations without a doctor's note.

In July of 1992, Ms. Bausman first notified IBC that she had suffered a repetitive stress injury to her wrist, elbow and shoulder caused by her work at the IBC bakery. While she was given warnings concerning her job performance and attendance in September 1992, from September of 1992 until May 1994, IBC did not discipline Bausman for any reason.

Though she was absent from work during this period, most of the absences were attributed to her work-caused medical condition. Bausman underwent surgery for her condition on January 14, 1993, and consequently missed weeks of work. IBC did not assess any points for those absences.

In March of 1993, Bausman's physicians released her for work with certain restrictions, and IBC provided her work within those restrictions. In April of 1993, Bausman's physicians released her for work without any restrictions.

In May of 1993, Bausman sought and obtained a position on a line that required monitoring and removing wrapped cake products from a conveyor into a shipping tray. IBC rotates employees on this line every several hours to avoid employees doing the same task for the entire work day.

On May 2, 1994, IBC issued Bausman an oral warning for excessive absences. The written notice accompanying the May 2 warning listed six dates on which Bausman had been late or absent: November 9, 1993, and February 3, February 7, April 26, April 28, and May 1, 1994. (Supp. App. at 48-50.) Bausman testified that she met with her supervisor, Brett Drum, concerning this warning and told him that the absences in April were due to her work-related injury. Bausman presented a note dated May 4, 1994, from her family physician, Dr. Bernard, who was not authorized to treat her for the work-related stress injury, stating: "Please excuse from work due to medical problems for dates April 26, 27, & 28." (Supp. App. at 240.) As a result of this physician's note, IBC charged Bausman with only one absence for April 26 through 28. Bausman, however, never presented a physician's note stating that one or more of the absences listed on the May 2nd warning were due to work-related injury, and

conceded that she was late on February 7, 1994 because of a schedule change and not due to any such injury. (Supp. App. at 50.) Thus, as of May 2, 1994, by IBC's count, Ms. Bausman had accrued five absences under IBC's written attendance policy.

Ms. Bausman testified that she was unaware of any requirement for a physician's note regarding absences due to work-related injury and that she believed the company was obligated to accept her statement concerning her absences being the result of a work-related injury. She did acknowledge that she had been told by her supervisors to bring notes from her physician and that on occasion she had brought such notes.

After the May 2 warning, Bausman was absent from work for approximately two weeks commencing May 3, 1994. Bausman testified that she called Todd Crook at IBC and "told him that I had called the doctor and talked to him about being sick quite a bit, due to the medication for my arm, and that would take about two weeks to get it healed. I told this to Todd, and he said, 'Fine, you will need a doctor's slip.' " (Supp. App. 104). With regard to this absence, Bausman presented two notes from Dr. Bernard. The note dated May 6, 1994, said: "Please excuse from work." (*Id.* at 240.) The note dated May 11, 1994, said: "May return to work." (*Id.* at 242.) At some point, Bausman gave IBC a Family and Medical Leave Act physician's certification form completed, signed

and dated by Dr. Bernard on May 5, 1994. The certification states that Dr. Bernard saw Bausman on May 4, 1994, diagnosed her condition as "gastritis" commencing April 26, 1994, prescribed a medication, and concluded that Bausman "does not need to be off work for current condition." (*Id.* at 258.) Because of these physician's notes, IBC charged Bausman with only one absence for the multiple days of work missed beginning on May 3, 1994.

Bausman again was absent on May 25, 1994, and presented no doctor's note concerning this absence. On May 26, 1994, IBC issued an "Habitual Absentee Final Warning" that listed nine dates over the past twelve months when she failed to work as scheduled, adding June 5, 1993, August 2, 1993, May 3, 1994, and May 25, 1994 to the five absences she had accrued under the May 2 warning. The warning further stated: "As of 5-26-94, your record will be frozen at your current level of 9 absences. *Any absences in the next six months before 11-25-94 will result in your discharge.*" (Supp. App. at 238.) Thereafter, Bausman did not present a doctor's note that explicitly identified any of the nine absences on the Final Warning as being due to her work-caused medical condition.

After receiving the Final Warning, Bausman left work early on May 27, 1994, and subsequently was absent from work for many of the days through June 17, 1994. Concerning these absences, Ms. Bausman presented to IBC the

following two notes from her family physician, Dr. Bernard: "Cindy needs to remain off work until I see her 6/6/94," dated May 31, 1994; and "Cindy may return to work," dated June 6, 1994; she also presented IBC with a physician's note dated June 16, 1994, from Newman Memorial County Hospital which stated, "needs to stay off work until hives gone for 24 hrs." (Supp. App. at 250, 252, 254.) None of these notes said that Bausman's absences or treatment were due to a work-related injury.

On June 24 and July 2, 1994, Bausman left work early saying her arm was sore. Her supervisor, Brett Drum, replaced her and told her that she must bring back a physician's slip when she returned to work. Bausman did not present any note from a physician concerning these two absences.

On July 5, 1994, Bausman was terminated. Donald Wilson, the production manager, called Bausman at home telling her that she need not report to work that day as she had been terminated for absences. The decision to fire Bausman was made by Robert Lincoln, the personnel manager, and Donald Wilson. In documenting the termination, the plaintiff's supervisor, Brett Drum, recorded on the "Notice of Separation" that Bausman was fired for "excessive absenteeism" with the following explanation: "She was going home early far too many times. She also was calling in at an excessive rate." (App. 30.) Lincoln testified that

-13-

Bausman was fired solely because of her attendance record and not for her job performance, attitude, or other violations of company rules.

On appeal, neither Ms. Bausman nor IBC has disputed the district court's recital of these facts. It thus remains uncontroverted that:

> [a]t the time of Bausman's termination, Lincoln knew that Bausman had left work early complaining occasionally of a sore arm and "of physical difficulties with the same parts of her body for which she was making a workers' compensation claim." . . . Lincoln further knew at the time that Bausman's attorneys had written a letter dated June 13, 1994, taking the position that all of Bausman's "absences since April 26 through today are part and parcel of her workers' compensation claim." . . . As for specific absences, Lincoln knew that Bausman was claiming she went home early on May 27th and went to the emergency room with complaints of arm pain and that he had received from someone a message which said that Bausman's absences on May 28th and 29th were due to "work comp."

*Bausman v. Interstate Brands Corp.*, 50 F. Supp. 2d 1028, 1032-35 (D. Kan. 1999) (record citations omitted).

**The District Court's Grant of Summary Judgment**

The district court concluded that Ms. Bausman had "established a prima facie case of retaliatory discharge." 50 F. Supp. 2d at 1043. Indeed, the facts remain uncontroverted that Ms. Bausman suffered a work-related injury for which she made a claim for workers' compensation, that IBC knew of her claim, and that IBC terminated her employment. The only element in genuine dispute is the causal connection element, and with respect to that element, the district court ruled that the record "reflects a genuine issue of material fact concerning the

-14-

defendant's knowledge regarding the cause of one or more of these absences," *id.*, and presumably a genuine issue as to the retaliatory intent that may be inferred from such knowledge.

This court agrees that Ms. Bausman has alleged a retaliatory discharge claim sufficient to raise a triable issue of fact as to her prima facie case, particularly when all reasonable inferences are drawn in her favor as the non-moving party. That being so, the burden would thus shift to IBC to refute the prima facie case by offering a legitimate non-retaliatory motive for the discharge.

For purposes of summary judgment, the district court concluded that "IBC's stated ground for terminating Bausman is a legitimate, non-retaliatory reason for discharge even though one or more of Bausman's absences may have been due to a work-related medical condition." 50 F. Supp. 2d at 1044. While not phrased in terms of summary judgment, the district court's ruling effectively determined that IBC has raised a triable issue as to its proffered legitimate, non-retaliatory reason for discharging Ms. Bausman. This court agrees.

IBC having articulated a facially legitimate reason, "the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321 (10th Cir. 1997). "Demonstrating pretext gets plaintiff 'over the hurdle of summary judgment.'" *Id.* at 1323 (quoting *Randle v. City of Aurora*, 69 F.3d 441,

452 (10th Cir. 1995)).  Ms. Bausman need not affirmatively demonstrate that

retaliatory reasons motivated IBC's decision:

> Pretext can be shown by " 'such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its action that a reasonable factfinder
> could rationally find them unworthy of credence and hence infer that
> the employer did not act for the asserted non-discriminatory
> reasons.'" *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951-52
> (3d Cir.1996) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d
> Cir.1994) (further citation omitted)).

*Id.*  Of course, "'[M]ere conjecture that [the] employer's explanation is a pretext .

. . is an insufficient basis for denial of summary judgment.'  *Branson v. Price*

*River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988)."  *Id.*

The district court examined the evidence in the record in some detail,

including the deposition testimony of Ms. Bausman and her supervisors and

managers at IBC.  Finding the testimony somewhat ambiguous, the district court

nevertheless concluded that Ms. Bausman failed to come forward with evidence

"as to whether IBC's proffered reasons were unworthy of belief" sufficient to

raise a genuine issue of material fact as to pretext, thereby defeating summary

judgment:

> On the record as it stands, no reasonable jury could find by a
> preponderance of evidence which is clear and convincing that IBC's
> articulated business reasons were unworthy of belief and were not the
> real reasons for Bausman's discharge.   In short, the court concludes
> that the plaintiff would be unable to prove at trial that IBC
> terminated Bausman because she had filed a workers' compensation

claim and/or had sustained or aggravated a work-related injury for which she might seek workers' compensation benefits.

50 F. Supp. 2d at 1047-48.

The district court's conclusion was grounded upon Ms. Bausman's repeated failure to provide corroboration by a physician that her absences were a result of her work-related injury. Her failure to provide doctor's notes verifying her own assertions furnished a reasonable, legitimate and non-retaliatory basis for the enforcement of IBC's existing attendance policy; Ms. Bausman, the district court ruled, had been properly terminated in accordance with that policy.

IV

**What IBC Knew or Should Have Known**

IBC acknowledges that "Kansas law is that the employer is bound by what it knew or should have known." Yet in seeking to comply with Kansas law, IBC would confine what it "knew or should have known" about the reason for Ms. Bausman's absence to what it read in physician's notes submitted by Ms. Bausman.[2]

---

[2]This approach lies at the heart of the Affidavit of Robert Lincoln, which Bausman sought unsuccessfully to have stricken. The affidavit suggests that IBC could "know" only that which a doctor's note says. The district court recognized that Lincoln "generally distinguished between his knowledge of what Bausman was claiming as her reason for the absences and the company's knowledge about the absences based on the company's absenteeism policy and practice." 50 F. Supp.2d at 1031.

-17-

In many instances, an employer's request for corroboration by a medical professional of an employee's claim of absence due to injury represents a reasonable means of investigating and verifying the reason for an employee's absence. It does not unduly burden or restrict an employee's statutory right to workers' compensation for a work-related injury to request third-party verification where there is room for doubt concerning a particular absence.

At the same time, an employer cannot adopt a workplace policy by which the employer abdicates its duty to see, to hear, and to think. The fact that some issues that arise in the workplace prove difficult to decide does not mean that an employer need not decide them, or that they may routinely be avoided as a matter of "unwritten policy." The employer's policy itself must be informed by the public policy of the State of Kansas, which protects employees against termination for absenteeism where those absences result from a work-related injury and holds employers accountable for what they "knew or should have known" about the cause of an  employee's absence. This remains a fact-driven determination, not a question of unwritten policy.

Actual knowledge on the part of the employer satisfies the "notice of injury" requirement of the Kansas Workers' Compensation Act.   Kan. Stat. Ann. § 44-520 (requiring ten-day notice of an accident "except that actual knowledge of the accident by the employer or the employer's duly authorized agent shall

render the giving of such notice unnecessary."). Actual knowledge of an employee's absence due to a work-related injury likewise should suffice for purposes of the Kansas public policy vindicating the statutory workers' compensation remedy.

An employer may not limit in advance what it "knows or has reason to know" about an employee's absence due to workplace injury to only one kind or source of information, blinding itself to other observable facts. The Kansas "knew or should have known" standard charges an employer with knowledge of those *facts* concerning an employee's workplace injury reasonably available to the employer at the time. Kansas law enforces a rule of reason, a rule that must be applied even-handedly in balancing the interests of both the employer and its employees.[3]

Electing to hear only those explanations proffered by physicians, IBC deftly sidesteps the more problematic issues of employee credibility, and feigned injury or incapacity. Indeed, IBC's practice simply hands off these problematic issues to medical professionals to resolve, wholly discounting IBC's own knowledge of

---

[3]The district court understood that the Affidavit of Robert Lincoln, read in light of its limited frame of reference ( *viz.* , information gleaned solely from physician's notes) was not "false" or a "sham," or directly contradictory of Lincoln's deposition testimony, and the motion to strike therefore was properly denied. However, in light of the fact-driven nature of the *Coleman* inquiry, such a narrowly-drawn averment as to an employer's knowledge lends very little help to the court's inquiry.

what is happening in the workplace in favor of what verification an employee may or may not be able to obtain from a physician:

> Q. If you found that she was absent from work because of a work-related injury, but she did not have a doctor's note, would you take that absence off?
>
> A. No, I wouldn't.
>
> Q. Even if you believed her?
>
> A. Yes, even if I believe her, I wouldn't take it off.
>
> Q. Even if you formed in your own mind the opinion that the lady was off work and missed a day's work because of a work-related injury, if you didn't have a doctor's excuse, you would still accept the penalty, correct?
>
> A. Right.

(App. 194 (deposition of Donald Wilson).)

This goes too far. *Coleman* and its progeny expect an employer to act upon what *facts* it knows or should know, not upon an unwritten practice that leads to conscious avoidance of those facts on the part of the employer.

If absent third-party verification an employer would discount or reject an employee's assertion of work-related injury, then the request for verification should be explicit and unequivocal, leaving no uncertainty as to the information that is required. Otherwise, the practice merely becomes a trap for the unwary—a trap that could be relied upon to mask an employer's unlawful retaliatory intent, as is alleged in this case.

-20-

V

**Summary Judgment on the Issue of Pretext**

To affirm summary judgment, we must be able to conclude that Ms. Bausman "failed to produce any evidence from which a reasonable inference could be drawn" that IBC's proffered reasons for her termination were "pretextual." *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1291 (10th Cir. 2000).

To show pretext, Ms. Bausman relies upon essentially the same evidence that she earlier relied upon to establish her prima facie case concerning whether IBC knew or should have known that her absences were due to her work-related injury. Under the burden-shifting analysis, although the prima facie presumption of unlawful intent "'drops out of the picture' once the defendant meets its burden of production, . . . , the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom … on the issue of whether the defendant's explanation is pretextual,'" *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106 (2000) (citations omitted) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n. 10 (1981)). And "a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability," even absent "additional, independent evidence of discrimination" or other unlawful intent. *Id.*, 530 U.S. at 149, 120 S.Ct. at 2109.

-21-

It remains uncontroverted that IBC knew Ms. Bausman claimed almost all of her 1994 absences as resulting from her work-related injury, and that she had filed a workers' compensation claim based upon that injury. Just as was drawn in connection with her prima facie case, an inference may be drawn that IBC acted with unlawful retaliatory intent, notwithstanding its asserted "neutral" reason for the discharge.

An inference favorable to Bausman may also be drawn from the fact that the formal warnings she received from IBC make no explicit reference to that which IBC insists it needed: *a physician's corroboration that Bausman's absences resulted from her work-related injury*. (Supp. App. 236, 238.) While she was supplied with a Family and Medical Leave Act form, which was completed by her doctor and returned to IBC, (*id.* 258), IBC furnished no form or questionnaire seeking information about the *work-related* nature of her health problems. Instead, her supervisor made verbal requests for "a doctor's note," several of which Ms. Bausman provided in 1994. On the present record, it remains unclear whether prior to deciding to terminate her employment, IBC communicated to Bausman its dissatisfaction with the form or content of the physician's notes she had submitted.

On the present record, it also appears that IBC had excused Ms. Bausman's absences due to her work-related injury from September 1992 until early 1994,

assessing no attendance points against her, and apparently doing so without benefit of detailed physician's notes. However, her injury did not go away. While Ms. Bausman had received surgical treatment in 1993, and thereafter was taking medications for her repetitive stress injury to her arm, it was apparent from the facts known to her supervisor that she continued to struggle with frequent arm soreness, coupled with gastric disturbances, and that these chronic problems were persisting into May and June 1994. (*See* Supp. App. 124, 131.) Ms. Bausman's claim for workers' compensation for this injury likewise continued to accrue—a fact which a jury could reasonably conclude IBC managers knew at the time the decision was made to terminate her employment.

Ms. Bausman also points to other IBC practices in the workplace as evidencing anti-worker's compensation animus. Through various job safety "incentive" programs, IBC at least in the past has been treading the fine line between encouragement and embarrassment vis-a-vis employees who have suffered workplace injuries, such as providing red stripes saying "I had an accident" to be worn on an injured employee's hard hat for one year. Ms. Bausman urges that an inference of hostility, even a retaliatory animus towards workers' compensation claims, may be drawn from IBC's promotion of these programs. While not decisive of the issue, such evidence may support an inference of unlawful animus that taken together with other inferences, may

justify a finding that IBC's reliance on its unwritten practice may have been pretextual.

These are questions better suited for resolution by the finder of fact based upon the evidence presented and a first-hand opportunity to evaluate the credibility of the witnesses. We cannot say that appellant "failed to produce any evidence from which a reasonable inference could be drawn"in her favor concerning whether IBC's stated reason for her termination was pretextual. To the contrary, we conclude that Ms. Bausman raised a genuine issue of material fact concerning pretext, and that the summary judgment entered by the district court based upon this element of her retaliatory discharge claim was in error.

## CONCLUSION

The district court's order denying the motion to strike the Affidavit of Robert Lincoln is AFFIRMED; the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this Opinion.