Chad M. ADKINS and Julie A. Rasmussen, Plaintiffs,

v.

U S WEST COMMUNICATIONS, INC., a Colorado corporation, Defendant.

No. CIV.A.99–K–815.

United States District Court, D. Colorado.

Dec. 20, 2001.

Brent Richard Ruther, Miller, Jester & Kearney, Denver, CO, Elizabeth Lamb Kearney, Berthoud, CO, for plaintiffs.

Charles D. Henson, Kutak Rock, LLP, Denver, CO, Cynthia P. Delaney, William Albert Wright, Sherman & Howard, Denver, CO, Karen H. DuWaldt, Qwest Communications International, Inc., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Plaintiffs Chad M. Adkins and Julie A. Rasmussen assert age and length-of-service discrimination and other claims against their former employer, Defendant U S WEST Communications, Inc. ("U S WEST"), in connection with their discharge from the company. U S WEST filed separate motions for summary judgment against each Plaintiff on all claims. For the reasons stated below, I grant U S WEST's motions and order that summary judgment be entered against Plaintiffs.

### *BACKGROUND*

The following facts are undisputed unless otherwise stated.

Adkins and Rasmussen were both long-term employees of U S WEST working as "traditional" directory assistance operators in the company's Pueblo operator facility at the time of their discharge. Both were discharged by Mary Kiser, the U S WEST Area Manager for the Pueblo facility. Both were members of the Communications Workers of America (the "Union") and the terms and conditions of their employment were set forth in a collective bargaining agreement ("CBA") between U S West and the Union. Both Plaintiffs contend they were discharged because U S WEST prefers to employ less costly "term operators," also known as Customer Ser-

vice Agents ("CSAs"), rather than traditional operators such as Plaintiffs.

U S WEST responds it hires CSAs to man its national directory assistance program, which it launched in 1997. CSAs are a different class of operators from Plaintiffs' former positions because they are employed pursuant to a separate collective bargaining unit negotiated with the Union. U S WEST acknowledges the cost of employing CSAs is less than the cost of employing traditional operators whose employment is governed by the CBA, but denies that its employment of CSAs at a cost-savings supports an inference of age or benefits discrimination against Plaintiffs or is otherwise actionable conduct. It further asserts Plaintiffs were discharged for separate incidents of misconduct in violation of U S WEST's Code of Business Ethics and Conduct (U S WEST Ethics Code).

The remaining facts relevant to each Plaintiff's claims are set forth separately.

### A. Adkins

Adkins was employed as a traditional directory assistance operator with U S WEST from 1977 until October 30, 1997. At the time of his discharge, he was 40 years old and ten years away from qualifying for his service pension. As a directory assistance operator, Adkins was responsible for providing courteous service to U S WEST customers.

U S WEST, acting through Mary Kiser, discharged Adkins after an internal investigation prompted by a customer complaint determined he had verbally and sexually abused the customer by telling her, among other things, to "go to hell" and "suck vagina." Adkins denies making these statements, but admits such statements constitute gross customer abuse justifying

immediate termination of the offending operator. U S WEST did not replace Adkins after his discharge. Adkins grieved his discharge under the CBA, but dismissed his grievance before it went to arbitration.

In the twenty months before the incident that triggered his discharge, U S West had received four other customer complaints of rude, abusive or sexually harassing behavior that it traced to Adkins. During this period, U S WEST also twice reprimanded Adkins for using profanity in a voice loud enough to be overheard by co-workers and customers. In addition, in three of the four observations of his work during this period, Adkins' supervisors rated his performance as unsatisfactory. As a result of these ratings and a March 14, 1997 customer complaint traced to Adkins, U S WEST had warned Adkins in writing that if his performance was unsatisfactory or prompted another customer complaint before October 1, 1997, further disciplinary action, up to and including dismissal, would be taken against him. The customer complaint that led to Adkins' discharge occurred on September 23, 1997.

Before the 1996 and 1997 incidents described above, Adkins had received at least one other customer complaint, but had also received commendations from customers for providing excellent service. His supervisor for 1994–95 testified that Adkins' customer service ran "hot and cold" and that he was at times rude and condescending with customers.

Adkins alleges that the 1996–97 incidents described above were part of an effort by U S WEST to set him and other long-term operators up for termination because of the expense to the company of their compensation and benefits. Based on this contention, Adkins asserts claims for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626 *et seq.;* discrimination to avoid payment of benefits in violation of section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140; and state law claims for breach of the covenant of good faith and fair dealing and promissory estoppel based on the CBA and U S WEST Ethics Code.

## B. Rasmussen

Rasmussen worked for U S WEST as a traditional directory assistance operator from 1975 until November, 1997. On November 11, 1997, she became upset when a co-worker, Phyllis Edwards, challenged her right to extra time off and slapped her in the face in front of two witnesses. Although Edwards reacted angrily to being struck, neither she nor the witnesses reported the incident to a supervisor. Nonetheless, someone with U S WEST management heard of the incident and reported it to Rasmussen's supervisor, Deliteful Quintana, the next day.

Quintana and another U S WEST manager promptly investigated the incident by interviewing Rasmussen, Edwards and the two witnesses. All confirmed Rasmussen had struck Edwards in the face and that Edwards had reacted angrily. At least one witness also stated Rasmussen cursed Edwards before striking her. None suggested Rasmussen had acted in jest.

The results of the investigation were reported to Mary Kiser, who then discharged Rasmussen for violating the workplace violence policy stated in the U S WEST Ethics Code. This policy states: "U S WEST prohibits violence or threats of violence at work. This prohibition includes threatening language, both verbal and written, threatening gestures, and/or actual physical fighting by any employee." Rasmussen had received a copy of the

Code and training on it within one and one-half months of her discharge.

At the time of her discharge, Rasmussen was qualified for a deferred pension and would have qualified for the next level of benefits, a service pension, within seven years. No one at U S WEST, including her managers, ever told her she was being discharged to avoid payment of pension, medical or dental benefits or out of a desire to save money.

Rasmussen filed a grievance under the CBA regarding her discharge, which the Union decided not to pursue to arbitration. Rasmussen did not appeal the Union's decision by the relevant deadline.

In this action, Rasmussen asserts U S WEST discriminated against her to avoid payment of benefits in violation of ERISA section 510 and also asserts state law claims for breach of the covenant of good faith and fair dealing and promissory estoppel based on the CBA and the U S WEST Ethics Code.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, I view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Simms v. Oklahoma ex rel. Dep't Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.1999). Although the movant must show the absence of a genuine issue of material fact, it need not negate the nonmovant's claim. *Id.*

Once the movant carries its burden, the nonmovant cannot rest upon its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Id.* Only genuine disputes as to material facts, that is "facts that might affect the outcome of the suit under governing law," will preclude entry of summary judgment. *Schwartz v. Bhd. of Maint. of Way Employes,* 264 F.3d 1181, 1183 (10th Cir.2001).

A genuine issue of fact exists "if a rational juror could decide the disputed factual allegations in the [non-movant's] favor based on the evidence presented." *Id.* Thus, to avoid summary judgment, there must be more than a scintilla of evidence supporting the nonmovant's position on the material facts, *Simms,* 165 F.3d at 1326, and evidence that is merely colorable or is not significantly probative does not suffice. *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir.1993). Allegations without "any significant probative evidence tending to support the complaint" are likewise insufficient, *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), as are conclusory statements that factual disputes exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Plaintiffs' Discrimination Claims

#### 1. Analytical Framework

Both Adkins and Rasmussen rely on indirect evidence of discrimination to support their ADEA and ERISA discrimination claims. Accordingly, I review each of these claims under the analytical framework first pronounced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hardy v. S.F. Phosphates Ltd. Co.,* 185 F.3d 1076, 1079 (10th Cir.1999) (age discrimination); *Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 559 (11th Cir.1997) (ERISA discrimination); *Gava-*

*lik v. Cont'l Can Co.*, 812 F.2d 834, 852–53 (3rd Cir.1987) (same).

In the context of a defendant's motion for summary judgment, once the defendant carries its burden of demonstrating the absence of any genuine issues of material fact and that it is entitled to judgment as a matter of law, the *McDonnell Douglas* framework requires the plaintiff to present evidence sufficient for a rational juror to find in its favor on each element of its prima facie discrimination claim. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999); *Morgan,* 108 F.3d at 1323 (plaintiff must raise a genuine issue of material fact as to each element of its prima facie case). If the plaintiff succeeds in this effort, then the burden shifts to the defendant to come forward with a nondiscriminatory reason for its employment decision. *Anderson,* 181 F.3d at 1178; *Morgan,* 108 F.3d at 1323. The defendant's burden is one of production, not persuasion, and the truthfulness of any nondiscriminatory explanation it proffers is assumed. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once the defendant presents a non-discriminatory reason for its actions, "the burden shifts back to the Plaintiff to show that 'there is a genuine issue of material fact as to whether the employer's proffered reason for the challenged action is pretextual, *i.e.,* unworthy of belief.'" *Anderson,* 181 F.3d at 1178 (quoting *Morgan,* 108 F.3d at 1323). The plaintiff can meet this burden by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan,* 108 F.3d at 1323 (internal quotations omitted); *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324, 327–28 (10th Cir.1996). A plaintiff may also demonstrate pretext by showing "that a discriminatory reason more likely motivated the employer." *Marx,* 76 F.3d at 327. However, "[m]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Morgan,* 108 F.3d at 1323 (internal quotation omitted); *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1120 (10th Cir.2001).

U S WEST submitted more than sufficient evidence to carry its initial burden of stating and supporting undisputed facts entitling it to judgment as a matter of law on Plaintiffs' discrimination claims. The burden therefore shifted to Adkins and Rasmussen to present evidence raising a genuine issue of material fact as to each element of their respective discrimination claims. U S WEST argues neither Plaintiff met this burden with respect to any of their discrimination claims. While I tend to agree, I do not base my decision on this ground because, even if Plaintiffs had established prima facie cases of age and ERISA discrimination, they have failed to show that there is a genuine issue of material fact as whether U S WEST's stated reason for their discharge, *i.e.,* Plaintiffs' misconduct, was a pretext for unlawful discrimination.

## 2. Adkins' Evidence of Pretext

Adkins asserts there is a genuine issue of fact that his discharge was a pretext for age and ERISA discrimination because he presented evidence from which a reasonable juror could infer that U S WEST set him up or framed him for the misconduct for which he was discharged. The evidence he relies upon is: (1) his allegedly unblemished customer service record before 1996 and U S WEST's fail-

ure to consult with his prior managers about his record before discharging him; (2) various "suspicious" circumstances allegedly suggesting that the customer service complaints U S WEST traced to him in 1996 and 1997, including the September 23, 1997 complaint for which he was discharged, either did not occur or were improperly attributed to him; and (3) that a large number of other traditional directory assistance operators were terminated in 1996–97 for misconduct or customer service problems.

This evidence does not establish a genuine issue of fact as to pretext. There is undisputed evidence in the record that Adkins had a history of making inappropriate remarks to customers before 1996.[1] Even if this fact were disputed, it is immaterial because Adkins admitted that the September 23, 1997 incident alone constituted gross customer abuse justifying immediate termination of the responsible operator.

The "suspicious" circumstances reported by Adkins regarding the September 23, 1997 and other customer complaints traced to him, even if sufficient to cast doubt on his responsibility for the incidents underlying these complaints,[2] are only material if they raise a genuine doubt as to the decision-maker's good faith belief in the proffered reason for discharge. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998); *see Kendrick v. Penske*

*Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000). None of the evidence presented by Adkins suggests that Mary Kiser, the U S WEST manager who made the decision to discharge him, did not believe at the time she made her decision that Adkins was the operator who made the vulgar comments reported by the U S WEST customer on September 23, 1997. Adkins did not present any evidence that U S WEST conducted a sham investigation into this incident or that Kiser's conclusion that Adkins was responsible was inconsistent with the evidence before her. *See Kendrick*, 220 F.3d at 1231 (considering these factors in evaluating the decision-maker's good faith belief in the proffered reason for discharge). The undisputed evidence shows that Kiser discharged Adkins for gross customer abuse in a directory assistance call on September 23, 1997. Adkins' denial that he was the responsible operator and his speculation that Kiser was motivated to save costs is not sufficient to establish pretext. *See id.* at 1232; *Bausman*, 252 F.3d at 1120.

Adkins also argues a genuine issue of fact exists as to pretext because a large number of traditional operators were terminated for misconduct or poor customer service after U S WEST began hiring less costly CSAs. Adkins' speculation of discriminatory motive based on this alleged fact[3] is not sufficient for a rational juror to

---

1. Adkins did not cite any evidence in the record supporting his claim of an unblemished customer service record. *See* Adkins' Memo. Br. at 5 (denying ¶ 29 of U S WEST's statement of undisputed facts), 9 (¶ 49 of Adkins' statement of additional undisputed facts).

2. In fact, there is little in Adkins' complaints that raises any genuine question that he was the operator responsible for the September 23, 1997 and other incidents traced to him. His contention, for example, that he could not have made the comments reported in the Sep-

tember 23, 1997 complaint because they would have been overheard and reported by his co-workers is simply unsupported by the evidence.

3. The only evidence Adkins presented supporting this alleged fact was his own conclusory statements, which are not sufficient to create a genuine issue of fact, *see Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1418 (10th Cir.1993), and a summary of the hiring and termination dates of all operators, including CSAs, who worked at the Pueblo facility from 1990 to 1999. The latter sum-

find that U S WEST's proffered reason for discharging Adkins was a pretext for unlawful discrimination. *See Bausman,* 252 F.3d at 1120. A triable issue of fact on pretext would be established, however, if, as Adkins may be implying, there is evidence that U S WEST discharged traditional operators such as himself for misconduct and poor service, but treated CSAs or other allegedly similarly-situated U S WEST employees who violated work rules of comparable seriousness differently. *Kendrick,* 220 F.3d at 1232 (evidence of such disparate treatment can establish pretext).

The only evidence in the record potentially relevant to such a theory of disparate treatment is a summary status report produced to Adkins by U S WEST that identifies all operators, including traditional operators and CSAs, who worked in U S WEST's Pueblo facility from 1990 to 1999. Adkins claims this report establishes that U S WEST terminated 198 of 319(62%) of traditional operators who worked in the Pueblo facility from 1990–1999, while hiring 211 new CSAs. U S WEST counters that Adkins misreads the report, which, in conjunction with other employee information U S WEST produced to Plaintiffs, actually shows that 408 traditional operators worked at the facility during this period, 80 (19.6%) of whom were involuntarily terminated for poor performance, misconduct or other reasons.[4]

The parties' dispute on these points is not material because, even accepting Adkins' account of U S WEST's employment

data, he has failed to establish a triable issue regarding pretext. Adkins did not even attempt to compare the rates at which U S WEST terminated traditional operators and CSAs during this period, or, more importantly, present any evidence that U S WEST treated similarly situated CSAs who committed misconduct comparable to Adkins' any differently than it treated Adkins. Absent such evidence, Adkins cannot establish pretext on a theory of disparate treatment. *See Kendrick,* 220 F.3d at 1232.

### 3. Rasmussen's Evidence of Pretext

■ U S WEST asserts it discharged Rasmussen because she violated its workplace violence policy when she struck her co-worker. Rasmussen contends there is a genuine issue of fact that this reason was a pretext for ERISA discrimination based on the following alleged facts: (1) U S WEST did not warn her of the consequences of engaging in violent or threatening conduct; (2) neither the co-worker she struck nor the witnesses to the incident interpreted the incident as violence; (3) other U S WEST employees who engaged in violent conduct were not disciplined and (4) a large number of traditional operators were terminated in 1996–97 for misconduct or customer service problems.

None of these alleged facts, alone or in combination, are sufficient for a reasonable juror to find that U S WEST's stated reason for discharging Rasmussen was

---

mary is not sufficient to establish the fact alleged for a number of reasons, including that: (1) it is not clear the summary focuses on the relevant time period, *i.e.,* the period during which U S WEST was employing both traditional operators and CSAs; (2) it does not differentiate between operators who left U S WEST voluntarily and those who were terminated because of misconduct or unsatis-

factory performance; and (3) it does not demonstrate that the rate at which U S WEST involuntarily terminated traditional operators was any higher after it began hiring CSAs than it was before.

4. U S WEST does not respond to Adkins' assertion regarding the number of CSAs hired during this period.

pretextual. Whether or not U S WEST ever specifically warned Rasmussen about violent or threatening conduct is immaterial. There is no evidence it had any obligation to do so and in any event it is undisputed that the U S WEST Code prohibits this conduct and that Rasmussen was familiar with the Code from her recent training and many years of employment with U S WEST.

The allegation that Edwards and the witnesses to Rasmussen striking Edwards did not consider the blow to be "violence" is unsupported by the record and is immaterial so long as the decision-maker, Mary Kiser, in good faith believed it was violence when she discharged Rasmussen for violation of U S WEST's workplace violence policy. *See McKnight,* 149 F.3d at 1129; *see Kendrick,* 220 F.3d at 1231. There was no evidence before Kiser at the time she made her decision that Rasmussen struck Edwards in jest or in a bit of horseplay as Rasmussen now argues. Under these circumstances, a reasonable juror could not find that Rasmussen's striking of Edwards was anything other than a violent act prohibited by the U S WEST Ethics Code.

■ As described earlier, evidence that other similarly-situated, nonprotected U S WEST employees who engaged in comparable violent conduct were treated differently from Rasmussen would be sufficient to establish a genuine issue regarding pretext. *Kendrick,* 220 F.3d at 1232 (evidence of such disparate treatment can establish pretext). The only evidence Rasmussen presented on this point was the testimony of a Union representative that, interpreted most favorably to Rasmussen, reported that two U S WEST technicians at a different U S WEST facility were not

disciplined after fighting.[5] The deponent readily admitted, however, that he had no personal knowledge of the incident or any related disciplinary actions. Thus, this testimony is inadmissible hearsay.

■ Even if it were admissible, this evidence would not be sufficient to establish pretext because Rasmussen has not shown that these employees were similarly situated to her. "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline. A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Kendrick,* 220 F.3d at 1232 (internal citations and quotations omitted). Rasmussen has not presented evidence on any of these points and hence has not demonstrated that the U S WEST employees allegedly not discharged for fighting were similarly situated to her.

Rasmussen's final argument, that the discharge of "large numbers" of traditional operators such as herself after U S WEST began employing less costly CSAs, is identical to the argument advanced by Adkins on this point and does not establish a genuine issue of fact for the reasons stated above.

■ In summary, it is not the court's province to decide whether U S WEST's proffered nondiscriminatory reasons for discharging Adkins and Rasmussen were "wise, fair, or even correct ultimately, so long as [they were] the reasons for [their] termination." *Hardy,* 185 F.3d at 1083 (internal quotation omitted). Because Ad-

---

5. The other three incidents cited by Rasmussen, also drawn from the testimony of Union representative Ronald McKim, are not comparable on their face because they concerned threats of violence, rather than actual physical violence.

kins and Rasmussen have both failed to present evidence that would allow a reasonable juror to find these reasons were a pretext for unlawful discrimination, U S WEST is entitled to summary judgment on their respective discrimination claims.

## B. Plaintiffs' Remaining Claims

■ Plaintiffs both assert state law claims for breach of the duty of good faith and fair dealing in express and implied contracts and promissory estoppel. Both claims are premised on obligations allegedly arising under the CBA and the U S WEST Ethics Code to treat employees fairly and to involve the Union in investigations of misconduct and related disciplinary actions.

■ Section 301 of the Labor Management Relations Act, ("LMRA"), 29 U.S.C. § 185(a), preempts state law claims if the claims are based on rights or duties created by a collective bargaining unit or evaluation of the claims requires the interpretation or application of a collective bargaining unit. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *see Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 529 (10th Cir.1992). Plaintiffs assert their state law claims are not preempted under this rule because they are based on both the CBA and the Ethics Code, which they allege is a separate contract between them and U S WEST. Even if the Code is a separate contract, however, Plaintiffs admit their state law claims "relate to" the CBA. This is so because both the conduct Plaintiffs complain of, concerning U S WEST's investigation of their con-

duct and its disciplinary action against them, and the allegedly breached duties and promises, arise out of rights set forth in the CBA.[6] Under these circumstances, "[a]n analysis of whether [U S WEST] acted properly or not will inevitably require an analysis of what the CBA permitted." *Mock*, 971 F.2d at 530. Accordingly, Plaintiffs' state law claims are preempted by LMRA § 301. *Id.*

■ When Section 301 preempts a state law claim, the court must dismiss the claim or treat it as a claim for breach of the CBA brought pursuant to section 301. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 220–21, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). Even if I treat the state law claims as section 301 claims, dismissal is required as to Adkins' claims because he grieved his claim for breach of the CBA then withdrew the grievance before arbitration. As a result, he failed to exhaust his administrative remedies as required to bring a claim pursuant to section 301.[7] *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 163–64, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Rasmussen's state law claims also may not proceed as section 301 claims because she grieved her claim for breach of the CBA and failed to appeal the denial of that grievance. Her dispute was therefore resolved in accordance with the CBA and this resolution is conclusive absent a claim and ultimately proof that the Union breached its duty of fair representation. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). As Rasmussen has not asserted any such

---

**6.** Both Rasmussen and Adkins testified that U S WEST had breached duties allegedly arising under Code by breaching provisions of the CBA dealing with fair dealings between the parties and investigations and disciplinary actions concerning Union members.

**7.** Adkins presents no legal or factual support for his assertion that U S WEST waived the right to assert this defense by failing to proceed to arbitration.

claim against the Union, she may not proceed under section 301.

### *CONCLUSION*

For the reasons stated above, U S WEST's Motions for Summary Judgment are GRANTED. Judgement shall be entered against Plaintiffs and for U S WEST on all claims.